**McMILLEN FEEDS, INC. OF TEXAS et al.,
Appellants,**

**v.**

**Dale HARLOW, Appellee.**

**No. 11409.**

Court of Civil Appeals of Texas.

Austin.

June 29, 1966.

Rehearing Denied July 20, 1966.

Foreman, Dyess, Prewett, Henderson & Cantey, A. D. Dyess, Jr., Houston, Coleman Gay, Austin, for appellants.

Reuben Senterfitt, San Saba, Lee Curtis, Belton, Abney, Hammett & Lynch, J. V. Hammett, Lampasas, for appellee.

PHILLIPS, Justice.

This is a products liability case. The appellee, plaintiff below, brought suit against the appellants feed companies for damages to his turkeys allegedly caused by feed furnished under contract. In response to special issues answered by the jury favorably to appellee, the court entered judgment against the appellants feed companies for $259,646.60.

We affirm.

### I.

Appellant McMillen Feeds, Inc. of Texas is engaged in the feed business and is a wholly owned subsidiary of appellant Central Soya. Appellants are in the business of producing and selling various animal feeds, including turkey feeds under the trade name of Master Mix.

Early in 1963 the parties hereto entered into a verbal agreement which included the following provisions:

Appellants sold, and were to deliver to appellee, Master Mix turkey feed from their plant at Lockhart, Texas to be used in feeding all of appellee's turkeys for the year 1963. The parties contemplated about 250,000 turkeys for the season, of which 158,050 were started.

The Master Mix turkey feed was to be fed according to appellants' directions.

The feed for some of the turkeys was to be a complete turkey feed (which was later delivered in appellants' sealed bags) to which the grower added nothing. The feed for the remainder of the turkeys was to be mixed with milo by the grower and fed according to appellants' directions.

Appellants were to deliver the Master Mix feeds partly in sealed bags and the remainder in bulk.

Appellants were to finance all of the turkey feed, including the milo that was to be purchased by appellee, the turkey poults, and such medication as might be necessary. The parties contemplated that it would cost about $3.40 to market each turkey of which 40¢ was to cover the labor to be furnished by appellee. Appellants agreed to finance each bird at $3.00. As a part of this financing arrangement, it was further agreed that each flock would constitute a separate transaction, it being understood that as appellee would deliver the 1-day old poults in flocks of several thousand each to the grower's brooder, a set of security instruments (turkey feed agreement, notes, chattel mortgage) prepared and furnished by appellants would be executed by appellee and would apply only to that particular flock to which the instruments referred.

All of appellee's growers, (located at ten different locations scattered over a wide area of central Texas) as well as their respective farms, pens and ranges, brooders, houses and litter, their feeding and watering facilities and equipment for caring for the turkeys were to be inspected and approved by representatives of appellants in advance.

Appellants were to furnish an expert in the care and feeding of turkeys who was to make frequent visits to each flock to work with appellee and his growers, to check regularly on the feed consumption and growth rates of the turkeys. Their growth rates were to be measured by references to Dr. Scott's Turkey World charts. He was also to check feed requirements, health and medication, sanitation and other management practices, and finally, the marketing of the turkeys.

In response to this agreement, appellee placed about 158,050 turkeys with the various growers during the 1963 season. This season began around February 1 with the first flock and ended around January 2 or 3, 1964 when the last flock was marketed; the milo used to mix with part of the feed delivered was to be, and according to the record was, U. S. Government number 2 grade, or better.

The feed was delivered as agreed. Some of the Master Mix turkey feeds were delivered by appellants directly into self-feeders and some were delivered into weather-proof storage bins on the grower's farms that had been previously approved by appellants for the purpose. Except to mix milo with the Master Mix feed in those instances calling for it, no changes or adulterations were ever made to any of the Master Mix turkey feeds after delivery thereof to the feeders or to the storage bins. The milo was mixed according to appellants' directions. The feed was fed within the times contemplated and intended by the parties, and at all times under and according to the directions of appellants' representative and any suggestion this representative made in reference thereto was followed by appellee.

At the beginning of the 1963 season, appellants moved one of their employees, a Mr. Don Hurst, from Ohio to Texas to service appellee's operation as agreed.

Prior to the start of the 1963 season several of appellants' representatives visited and approved all of the appellee's growers, their farms and equipment. Each of these growers had grown turkeys in the past.

The turkeys were located with 10 different growers whose farms were spread over

an area of central Texas extending some 175 miles north-south and 70 miles east-west, from Jolleyville near Austin to Desdemona and Rising Star and from San Saba to Eden.

Each flock of turkeys placed with a grower constituted a "round." Each grower handled at least two "rounds" and some of them as many as three during 1963. Each flock or "round" of 1-day old poults included both sexes. These were later divided into two flocks, one for each sex. The hens and toms were fed differently according to the directions of appellants. The hens were due to be sent to market at 22–24 weeks of age followed by the toms at 24–26 weeks of age.

As the turkeys reached the age of 14–16 weeks (having eaten Master Mix turkey feeds all of their lives) they began to show similar symptoms in all the flocks among all the growers over the wide geographic area involved. The birds lost color, became "droopy" and unthrifty. Check-weights were significantly low and feed consumption abnormally high. When dressed, a sour, pungent odor pervaded the processing plant. This was an unusual condition not observed in any turkeys other than those fed on Master Mix turkey feeds, but present in all the turkeys that had been fed the Master Mix turkey feed.

Appellee noted the appearance of some of the symptoms in June and was concerned. Appellants' representative Hurst became concerned when the first flock went to market about June 6 and began searching for the cause when the toms from the same flock went to market about July 12.

Consequently, a large number of turkeys were examined at the State diagnostic laboratory in Stephenville, Texas and these reports disclosed that the birds examined had mycosis. These reports make no mention of copper poisoning which appellants contend was one of the causes of the turkeys' condition.

In connection with the mycosis and the copper poisoning, there were many expert witnesses called to testify for both parties to this lawsuit. Appellants contended that the mycosis found was a bacterial disease that damaged the turkeys unrelated to the feed. In addition, appellants claimed that the turkeys were damaged by the use of a product in the turkeys' water by the trade name of Ema-sol containing copper sulphate, that the use of Ema-sol caused copper poisoning.

Expert witnesses called by appellee were of the opinion that the mycosis found in the birds was a fungus condition, not caused by bacteria, and resulted from the feed used. Also, the evidence of copper poisoning was refuted. Several of these experts, as will be shown later in this opinion, were experts in the matter and made detailed examinations of the turkeys for appellee for the purpose of righting the conditions that were manifesting themselves. These experts testified that they did not find disease to be the problem and recommended that the turkeys' feed be changed.

Consequently, appellee divided a flock and fed one flock on feed from a competitive company and left the remainder on the Master Mix turkey feed. Appellants' representatives agreed that the birds on the competitive feed made a rapid and significant improvement over the birds fed Master Mix. A grower at Temple, Texas who had been using Master Mix changed his feed to a chicken feed with similar good results. Then appellants' representatives requested appellee to change the remainder of his turkeys to their chicken feed that contained no cotton seed meal. He did so and the turkeys immediately made significant improvement.

## II.

Appellants are before this Court on fifty-one points of error.

Their points of error one and two are those of the court in overruling the two defendant's motions for judgment non obstante veredicto. We overrule these points.

Appellants' points of error three through ten are their "no evidence" points (no evidence to support the answer of the jury as such finding is contrary to all the evidence in the case) pertinent to the jury's answers to special issues numbers 1 through 8.

■ Special Issue No. 1 inquired solely as to cottonseed meal in defendants' turkey feed and was as follows:

"Do you find from a preponderance of the evidence that the Defendants sold and delivered to the Plaintiff turkey feed containing cottonseed meal in quantities · harmful to Plaintiff's turkeys?"

The jury returned an affirmative answer to this issue and likewise to its companion issues numbers 2, 3 and 4 relating to producing cause, negligence and proximate cause, respectively.

Special Issue No. 5 was as follows:

"Do you find from a preponderance of the evidence that the Defendants sold and delivered to the Plaintiff turkey feeds that were unfit for feeding to Plaintiff's turkeys?"

The jury returned an affirmative answer to this issue and likewise to its companion issues numbers 6, 7 and 8 relating to producing cause, negligence and proximate cause, respectively.

Inasmuch as we find that there is sufficient evidence to support the jury's findings to special issues numbers 1 and 2 (producing cause) we find it unnecessary to pass on appellants' points three through 10.

### III.

Appellants' points of error 16 through 24 are their "insufficiency of evidence" points (verdict of jury was so greatly against the weight and preponderance of the evidence as to be manifestly wrong and unjust) relative to special issues one through eight outlined above.

The statement of facts in this case consists of 1334 pages exclusive of exhibits. As stated above, there was testimony from highly qualified experts on both sides of the question. After reviewing the entire record we hold that there is sufficient evidence, both direct and circumstantial, from both expert and lay witnesses from which the jury could have reasonably concluded that the turkey feed appellants sold and delivered to the appellee contained cottonseed meal in quantities harmful to appellee's turkeys and such was the producing cause of the harm caused and that such findings were not against the great weight and preponderance of the evidence. Consequently, we do not pass on the negligence aspects of the case or on the questions presented by special issue No. 5 and its accompanying issues 6, 7 and 8 (hereinafter stated).

Whatever else this case involves, ten widely separated growers all having turkeys showing the same symptoms of decline, some having been fed solely on Master Mix feed, some having been fed Master Mix feed with milo added; some having been fed Ema-sol (copper sulfate) in their drinking water, some not; some (according to appellants' expert witnesses) showing evidence of bacterial infection, some not; the only common denominator being Master Mix feed containing as much as 8% to 20% cottonseed meal. When a group of turkeys was taken off the Master Mix feed containing cottonseed meal and put on chicken feed containing no cottonseed meal, the improvement was dramatic.

Bearing these facts in mind, we turn to a summary of the opinion of the experts.

Dr. Roy G. Chaney is presently employed by the Texas Animal Health Commissioner as an area supervisor; however, he was formerly employed by the Federal Government and was inspector in charge of the poultry division of the U. S. Department of Agriculture stationed at Lampasas, Texas. It was while in the latter capacity that Dr. Chaney inspected many of ap-

pellee's turkeys at the processing plant at Lampasas.

Dr. Chaney testified that the turkeys in question were thin, had a bluish discoloration, anemia and a pungent, sour odor. That the symptoms were confined to appellee's turkeys. That the turkeys had no bacterial disease but suffered from a fungus condition caused either from feed or water. That the livers and other organs were studied and did not show any effect of copper sulphate poisoning (Ema-sol).

Dr. Archie Flowers testified for appellee. Dr. Flowers is a professor and is presently the head of the Department of Veterinary Public Health at Texas A. & M. His areas of professional interest include Virology, Immunology, Poultry Diseases and Laboratory Animal Medicine.

Dr. Flowers made a detailed examination of several of appellee's turkeys at appellee's request and found a non-specific enteritis (an inflammation of the intestines) not bacterial, round worms and mycosis. In answer to a hypothetical question asked him by appellee's attorney in which the general history of the turkeys outlined above was included, Dr. Flowers stated that, other things being constant, the feed was the cause. In addition, Dr. Flowers stated that in response to certain experiments in the poultry department at A. & M., certain diets will produce mycosis causing the fungus found in the birds.

Dr. James R. Couch testified for appellee. Dr. Couch is a professor at Texas A. & M. University whose speciality is nutrition and biochemistry. Dr. Couch testified that the feed formula concentrate embodied in Master Mix was not adequate nutritionally, that it was low in lysine, that the formula produces an imbalance of amino acids; that if turkeys were fed the formula one could expect less than maximum performance; that a formula containing 8% to 20% cottonseed meal when combined with milo gluten produced a deficiency in amino acids, that 5% cottonseed meal is the

maximum he would recommend in any turkey feed.

In response to a hypothetical question similar to that asked Dr. Flowers, Dr. Couch stated that in his opinion the feed had caused the conditions of the turkeys complained of.

There is also evidence that Don Hurst, appellants' representative who counseled appellee on his turkey operation, made statements to the effect that the feed was the cause, although Hurst denied these statements. There is also evidence that other of appellants' experts in studying the problem in the field, made similar statements. However, these also were denied.

Appellants also produced many highly qualified technical witnesses who testified to finding various diseases in the birds examined in the laboratory; that the mycosis common to a large percentage of the birds was bacterial; that in addition to the mycosis, there was evidence presented of salmonella (several types), trichomonad infection, round worms and also the mold infection that we have alluded to before. When asked whether trichmoniasis was the problem, appellants' witness Dr. Eugene Nicks (a veterinarian currently working for the Upjohn Company in Kalamazoo, Michigan doing poultry research) stated: "there was no single problem to the best of my knowledge. It was one of the problems in my considered opinion."

One of appellants' theories was that due to overcrowded conditions, wet, poorly-drained areas and insufficient sanitary conditions, disease had invaded the turkeys causing the damage complained of.

Dr. Nicks also testified that there was no live mold present (mycosis) in several of the birds he examined.

Appellants also presented evidence that the Ema-sol (copper sulphate) given the turkeys in their drinking water to counter the enteritis universally found in the birds, caused a copper poisoning.

In addition, appellants presented evidence that the summer of 1963 was very hot with many days over 100 degrees Fahrenheit; that the presence of Ema-sol in the water caused the turkeys to refrain from drinking the required amounts of water (in addition to evidence that spot checks revealed that several growers allowed the watering troughs to remain dry during the heat of the day) thus causing dehydration.

In addition, there was evidence that the turkey formula in question met the same nutritional standards as those used by appellants elsewhere in the United States.

The jury, in answer to special issues, found that appellee had failed to separate the diseased birds from the healthy birds but that such failure was not negligence; that he had not failed to move the healthy birds to different ground; that he had not failed to provide proper sanitation; that he had not failed to provide proper medication and that the result of the appellee's damage was not the result of an unavoidable accident.

■ This case involves the rule of strict liability that the law imposes on vendors of foods by virtue of an implied warranty of fitness. Our principal question here is causation. Jacob E. Decker & Sons v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479. Our sole concern here is the question of whether the 8½–20% cottonseed meal in the turkey feed caused the damage to the turkeys. Our problem is one of proof and the guidelines attendant thereto.

■ In Green v. Ralston Purina Company, 376 S.W.2d 119, the Supreme Court of Missouri stated the rules applicable here. Any disputed fact may be established by circumstantial as well as by direct evidence. In neither case is the burden of proof greater than the preponderance. This rule does not require the quality of absolute certainty, nor does it require the plaintiff to exclude every other possibility. All that is required of such rule is that the circumstances point to the ultimate fact sought to

be established with that degree of certainty as to make the conclusion reasonably probable. The court held that after showing the unwholesomeness of the product a prima facie case would be made where the evidence was susceptible to a reasonable inference that the death or illness resulted from the eating of unwholesome feed.

■ Using these rules as guidelines, we have ample evidence to uphold the findings of the jury with respect to the cottonseed meal. Appellants' own witness, (Dr. John W. West, a professor and head of the Department of poultry science at Oklahoma State University, and pioneer in the use of cottonseed meal in poultry feed) testified that the use of cottonseed meal in poultry feed was a deviation from the standard. There was expert evidence pointing to the cottonseed meal plus the web of circumstances surrounding it. Under the law in Texas, both had probative value. Trinity Universal Ins. Co. v. Walker, Tex.Civ.App., 203 S.W.2d 308, writ. ref., n. r. e.

### IV.

Appellee's points of error eleven through fifteen are "no evidence" points pertaining to Special Issues Nos. Y through Y–4. We overrule these points and will discuss these issues in connection with appellee's "insufficiency of evidence" points relative thereto.

### V.

Appellee's points of error twenty-five through thirty are his "insufficiency of evidence" points relative to Special Issues Nos. Y through Y–5. We overrule these points.

Special Issue No. Y is as follows:

"In what amount of money, if any, do you find from a preponderance of the evidence that the plaintiff has sustained damages, if any, by reason of his turkey's loss in weight or failure to gain weight which resulted from the use of such

turkey feeds, if any such loss or failure was so caused?

Answer in dollars and cents, if any

Answer *$66,000.00*

## SPECIAL ISSUE No. Y-1

In what amount of money, if any, do you find from a preponderance of the evidence that the plaintiff has sustained damages, if any, by reason of the death of plaintiff's turkeys, if any, which resulted from the use of such turkey feeds, if any such death was so caused?

Answer in dollars and cents, if any

Answer *$34,500,00*

## SPECIAL ISSUE No. Y-2

In what amount of money, if any, do you find from a preponderance of the evidence that plaintiff has sustained damages, if any, by reason of the condemnation of turkeys by Government Inspectors which resulted from the use of such turkey feeds, if any such condemnation was so caused?

Answer in dollars and cents, if any

Answer *$4,500.00*

## SPECIAL ISSUE No. Y-3

In what amount of money, if any, do you find from a preponderance of the evidence that plaintiff has sustained damages, if any, by reason of additional costs of production over and above normal costs of producing plaintiff's turkeys, if any, which resulted from the use of such turkey feeds, if any such additional cost was so caused?

Answer in dollars and cents, if any

Answer *$37,800.00*

You are further instructed that in answering Special Issues Nos. Y, Y-1, Y-2, Y-3, Y-5 and Y-6 you must exclude from your consideration any compensation for damages or injury, if any, to plaintiff's turkeys due to any one or more of the following, if you find any such to have existed:

(a) Disease, if any, not caused by feed, if any.

(b) Unusually hot weather, if any.

(c) Unprotected or inadequate water supply, if any you have so found.

(d) Inadequate shade for said turkeys, if you find such condition to exist.

(e) Failure to separate diseased birds from healthy birds, if you have found such failure.

(f) Failure to provide proper sanitation, if you have so found.

(g) Failure to provide proper medication, if you have so found.

## SPECIAL ISSUE No. Y-4

Do you find from a preponderance of the evidence that plaintiff's breeders were rendered unfit for breeding purposes, if they were, as a result of being fed the defendants' turkey feeds?

Answer YES or NO. Answer *yes*

If you have answered the above issue YES, then answer issues Nos. Y-5 and Y-6 otherwise you need not answer them.

## SPECIAL ISSUE No. Y-5

What do you find from a preponderance of the evidence was the fair cash market value of plaintiff's breeders, per bird, in Central Texas, immediately before being fed with defendants' turkey feeds?

Answer in dollars and cents, if any

Answer *$20.00*"

■ Inasmuch as appellants have chosen not to brief these points, we need not consider them. However, we note that appellee

has presented detailed evidence in respect to each of these points from which the jury could have reasonably concluded as they did.

## VI.

■■■ Appellants' points of error thirty-one through forty-two [1] are concerned with that part of the verdict allowing appellee recovery on the negligence and proximate cause of appellants in "selling and delivering turkey feeds that were unfit for feeding to plaintiff's turkeys." Inasmuch as we do not base our decision on these issues we will merely state them without further discussion.

1. "THIRTY-FIRST POINT: The trial court's Special Issue No. 5 was too broad and general, and hence was improper, because it inquired about too great a portion of the total factual picture and constituted a global submission of the entire case insofar as Defendants' liability was concerned. THIRTY-SECOND POINT: The trial court's Special Issue No. 5 was so vague, doubtful and uncertain of meaning as to be completely ambiguous and multifarious. THIRTY-THIRD POINT: The trial court's Special Issue No. 5 was in effect a submission of Res Ipsa Loquitur in that it does not require the Plaintiff to prove what fact or circumstances made Defendants' turkey feed unsatisfactory to Plaintiff or unfit for consumption by his turkeys. THIRTY-FOURTH POINT: The trial court's Special Issue No. 6 constituted a global submission in failing to inquire into any particular defect in Defendants' turkey feed that would cause it to be injurious or deleterious to Plaintiff's turkeys. THIRTY-FIFTH POINT: The trial court's Special Issue No. 6 constituted a comment on the weight of the evidence in that it relates to 'injuries' suffered by Plaintiff's turkeys, and thereby improperly calls attention to the possibility of physical harm or damage to the body of the turkeys. THIRTY-SIXTH POINT: The trial court erred in submitting Special Issue No. 7 because 'the sale and delivery of turkey feeds' would not in any event be negligence, it being an undisputed fact that there was a sale and delivery of De-

"SPECIAL ISSUE No. 5

Do you find from a preponderance of the evidence that the defendants sold and delivered to the plaintiff turkey feeds that were unfit for feeding to plaintiff's turkeys?

Answer YES or NO. Answer *Yes*

If you have answered the above issue YES, then answer issues Nos. 6, 7 and 8; otherwise you need not answer them.

SPECIAL ISSUE No. 6

Do you find from a preponderance of the evidence that such turkey feeds were

fendants' turkey feeds to the Plaintiff. THIRTY-SEVENTH POINT: The trial court's Special Issue No. 7 was too broad and general, and hence was improper, because it constituted a global submission of the entire case rather than requiring the jury to make its finding with respect to a single act, fact, or circumstance. THIRTY-EIGHTH POINT: The trial court's Special Issue No. 7 was so vague, doubtful and uncertain of meaning as to be completely ambiguous and multifarious. THIRTY-NINTH POINT: The trial court's Special Issue No. 7 was in effect a submission of Res Ipsa Loquitur in that it does not require the plaintiff to prove what fact or circumstances made Defendants' turkey feed unsatisfactory to Plaintiff or unfit for consumption by his turkeys. FORTIETH POINT: The trial court's Special Issue No. 8 was too broad and general, and hence was improper, because it constituted a global submission of the entire case rather than requiring the jury to make its finding with respect to a single act, fact, or circumstance. FORTY-FIRST POINT: The trial court's Special Issue No. 8 was so vague, doubtful and uncertain of meaning as to be completely ambiguous and multifarious. FORTY-SECOND POINT: The trial court's Special Issue No. 8 was in effect a submission of Res Ipsa Loquitur in that it does not require the Plaintiff to prove what fact or circumstance made Defendants' turkey feed unsatisfactory to Plaintiff or unfit for consumption by his turkeys."

a producing cause of the injuries, if any, suffered by plaintiff's turkeys?

Answer YES or NO. Answer *Yes*

SPECIAL ISSUE No. 7

Do you find from a preponderance of the evidence that the sale and delivery of such turkey feeds by the defendants was negligence, as that term is defined in this charge?

Answer YES or NO. Answer *Yes*

SPECIAL ISSUE No. 8

*Do you find from a preponderance of the evidence that such unfit turkey feeds, if you have so found, were a proximate cause of the injuries, if any, suffered by plaintiff's turkeys?*

Answer YES OR NO. Answer *Yes"*

VII.

Appellants' forty-third point of error is that of the trial court in submitting Special Issue No. Y for the reason that there is no evidence as to plaintiff's own experience in turkey raising which would justify a finding on the part of the jury that his turkeys normally gained as much weight as the gain shows in the tables which were introduced into evidence.

We overrule this point.

In Special Issue No. Y, stated fully above, the jury answered that appellee had sustained damages in the amount of $66,-000 by reason of his turkeys' loss in weight or failure to gain weight which resulted in the use of such turkey feeds.

Appellants contend that the only basis on which the jury could make any calculations as to the financial significance of the turkeys' weight loss or failure to gain weight was on a comparative basis with what the Turkey World Magazine (hereinafter discussed with reference to appellants' point of error forty-six) showed the turkeys should have weighed. Appellants further contend that nowhere in the record does the appellee himself testify as an expert witness as to the probability of his turkeys' weight after being fed for any certain period of time. That nowhere in the record is there testimony from any witness for appellee as to what the turkeys should have weighed.

The statement of facts contains over 100 pages of testimony showing in great detail the number of pounds of the weight loss and its value in dollars. This information is shown in respect to each flock of turkeys by each grower and it is in the record without objection. Summaries of this mass of detail were introduced without objection. It was shown therein that the total weight loss of all turkeys for the year is shown as 427,584.62 pounds, on which appellee lost $88,621.75. These computations of the loss of weight and the damages on account thereof were not contested by appellants and all of the evidence went into the record without objection. The amount of the weight loss damage found by the jury is substantially less than the evidence showed it to have been.

In this connection, Mr. Don Hurst, appellants' employee, testified in reference to the weight loss and the proper method for determining the amount of such loss. After testifying that there had been a definite, substantial weight loss by appellee's turkeys, he testified as follows:

"Q Well, let me rephrase that because that is not well said. From your observation of Mr. Harlow's flocks, and from your knowledge of the amount of feed that those turkeys had consumed, in reference to their age, were you surprised that they did not weigh as much as you thought they would?

A Yes, sir.

Q Now, Mr. Hurst, can you look at the table of standards that you were then using, and look upon the

weights of the turkeys as reflected in the reports furnished by the processor and sent to your company, and form an opinion about the number of pounds of that loss?

A Of marketable turkey weights?

Q Yes.

A I believe this could be done, yes."

Mr. Hurst was brought by appellants from Ohio to supervise appellee's turkey growing project in 1963. The testimony indicates that all of the parties at interest here used the same method to compute the amount of the weight loss damage. Such evidence further shows that appellants themselves, through their representative Hurst, had expected appellee's turkeys to meet the standard prescribed in the charts there referred to. See Schultz v. Harless, Tex.Civ.App., 271 S.W.2d 696; Lone Star Canal Co. v. Broussard, Tex.Civ.App., 176 S.W. 649, writ of error dism.; Chicago, R. I. & G. Ry. Co. v. Longbottom, Tex.Civ. App., 80 S.W. 542, writ of error refused.

### VIII.

Appellants' forty-fourth point of error is that of the trial court in submitting Special Issue No. Y–3 because the testimony is wholly insufficient in furnishing a basis of calculation for the jury and also is insufficient regarding the elements of cost for the year 1963 as compared with prior years.

We overrule this point.

Special Issue No. Y–3, restated, is as follows:

"In what amount of money, if any, do you find from a preponderance of the evidence that plaintiff has sustained damages, if any, by reason of additional costs of production over and above normal costs of producing plaintiff's turkeys, if any, which resulted from the use of such turkey feeds, if any such additional cost was so caused?"

There is an abundance of evidence in this record to the effect that the turkeys consumed more than the average amounts of feed that would usually be consumed by turkeys. Appellee arrived at his per bird cost of production by dividing the number of birds that were sold or kept into the amount of money that was actually spent on turkey production. This calculation indicates the cost of production per bird was $3.72. In this respect appellee testified as follows:

"Q I believe you testified yesterday that $3.40 per bird was the estimated and reasonably anticipated cost of production?

A That is true.

Q That both you and McMillen figured on when you started out?

A That's right.

Q If you will, tell us now when you multiplied $3.40 times the 133,346 birds, how much total money is that?

A $453,376.40.

Q Now, if you will, look at your subtraction, when you subtracted that figure from your total expense, which was $496,142.74, what did you get?

A I got a total of $42,766.34.

Q Now, I will ask you whether or not that is what you have referred to as the excessive cost of production of your turkeys in 1963?

A It is."

Appellee's profit and loss statement for the 1963 turkey operation, prepared by his accountant, shows appellee's actual expenses and his actual receipts for the year 1963. The bank statements constituting the basis for such profit and loss statements were introduced in evidence. There was no objection to the testimony that appellee's excessive cost of production

of his turkeys in 1963 was $42,766.34. The jury found this figure to be $37,800.00. We hold that there was sufficient evidence to uphold this finding.

### IX.

Appellants' forty-fifth point of error is that of the trial court in submitting Special Issue No. Y-4 in that it constituted a comment on the weight of the evidence in that it assumed that plaintiff's breeder turkeys were rendered unfit for breeding purposes by reason of being fed defendants' turkey feed.

We overrule this point.

Special Issue No. Y-4 was submitted as follows:

"Do you find from a preponderance of the evidence that plaintiff's breeders were rendered unfit for breeding purposes, if they were, as a result of being fed the defendant's turkey feeds?"

This issue properly places the burden on appellee. The question is direct and does not lend itself to any assumption whatever. Consequently, there is no comment on the weight of the evidence. In addition, there is ample evidence from which the jury could have concluded as it did.

### X.

Appellants' forty-sixth and forty-eighth points are briefed together.

The forty-sixth point is that of the trial court in admitting into evidence parts of certain magazines called "Turkey World" and in particular the charts contained therein, over defendant's objection that such parts and charts were hearsay.

The forty-eighth point is that of the trial court in admitting in evidence ledger sheets identified as plaintiff's exhibits P–74 through P–83 purporting to show the difference between the weights of turkeys as shown in the charts contained in "Turkey World" and the weights of plaintiff's turkeys over defendants' objection that such charts constituted hearsay.

We overrule these points.

In respect to the use of the tables of growth taken from the magazine "Turkey World" admitted in evidence and used as the basis of anticipated growth computations herein, we quote the following testimony from appellee:

"Q Mr. Harlow, I will ask you whether or not the turkey industry, the turkey producers industry, well, just the turkey industry, uses any kind of growth rate and feed consumption charts?

A Yes, sir, it does.

Q How do you use those charts?

A Those charts are used to determine the weights that the turkeys should attain at a certain age and on so much feed consumed, and certain mortality. It covers that. I would say mostly it would be a rule of thumb by the industry to determine what the turkeys should weigh at a certain age and how much feed they should consume.

Q Now, is there a magazine called 'Turkey World?'

A Yes, sir, there is.

Q Labeled business magazine for the turkey industry?

A Yes, sir.

Q Is this magazine used throughout the industry?

A Yes, sir, I would say it is used throughout the industry.

Q Mr. Harlow, I will ask you several questions concerning the growth rate; the feed consumption and growth standards for all varieties of turkeys. You have already identified the acceptance of this magazine called 'Turkey World' by the turkey

industry. I will ask you whether or not so far as you know it is used throughout the turkey industry?

A Yes, sir, as far as I know it is.

Q Are you or are you not familiar with the fact that each year the 'Turkey World' magazine in one of its issues will publish feed consumption and growth standards for all varieties of turkeys?

A Yes, sir, that is true.

Q I will ask you whether or not you make use of these charts each year?

A Yes, sir, we do.

Q I will ask you whether or not Mr. Don Hurst made use of these charts in 1963 in connection with your turkeys?

A Yes, sir."

The use of such charts in the industry was further established by the testimony of appellants' employee Hurst, who testified in this regard as follows:

"Q I will ask you if it isn't true that you have accepted standards of performances of turkeys by day of age, that is to say that they should weigh within certain ranges within certain ages?

A Yes, there are standards which we use for comparison purposes.

Q And those standards are in general use in the industry, are they not?

A Yes, I feel they would be standard in the industry.

Q And the standards that were used by you and by Mr. Harlow and Mr. Tidwell were those accepted standards?

A Yes."

■ Nutritionists Dr. Cravens and Dr. Middendorf who were appellants' witnesses in addition to appellee corroborated this testimony. The evidence establishes the fact that the charts in question are used extensively in the turkey growing business, are relied on and are one of the bases upon which the industry conducts its business. These charts were admissible as an exception to the hearsay rule as printed publications shown to be in general use among the class of persons interested in the matters which they contain. See 32 C.J.S. Evidence § 717, p. 1022; Wigmore on Evidence (3rd Ed.) Vol. VI, secs. 1702, 1706. We hold that a sufficient predicate had been laid by the witnesses referred to above and that the charts were admissible as evidence from which the jury could reasonably conclude what the turkeys should have weighed at that particular time in their cycle of growth. Also see Housden v. Berns, 241 Mo.App. 1163, 273 S.W.2d 794.

In overruling appellants' forty-eighth point we point out that the ledger sheets complained of were admitted into evidence without objection, that the same evidence in summary form was admitted without objection and in addition Mr. Harlow's verbal testimony to the same effect was admitted without objection. This evidence was merely cumulative of other evidence admitted without objection.

## XI.

■ Appellants' forty-seventh point of error is that of the trial court in admitting into evidence plaintiff's exhibits Nos. 85 and 86, purporting to be feed tags on turkey feed manufactured by Quaker Oats Company under the brand name "Full-O-Pep Super Turkey Grower Ration" over defendants' objection that such tags constituted hearsay.

We overrule this point.

The court admitted the tags for the limited purpose "of showing the guaranteed analysis and the list of the ingredients contained in the test feed, the Quaker Oats Full-O-Pep Feed, as it has been identified in the testimony at Mr. Stewart's farm near San Saba."

These two feed tags are not subject to the hearsay rule and were properly admitted.

There was a feeding experiment conducted at Mr. Stewart's farm in which two loads of Quaker Oats Full-O-Pep turkey feed covered by the tags were used. The purpose of the experiment was to compare the results of feeding such Quaker Oats Full-O-Pep feed to turkeys that had been on Master Mix turkey feed, to the results obtained from other turkeys that were continued on the Master Mix turkey feed. The main purpose of the tags was to show that the Quaker Oats feed did not contain cottonseed meal.

This experiment was made with the full knowledge, participation and cooperation of appellants. The two feed tags were delivered to the appellee with the Quaker Oats Company Full-O-Pep turkey feed used in such experiment. By agreement between Don Hurst for appellants and the appellee, the Quaker Oats turkey feed covered by said tags was financed by appellants.

The two feed tags in question were required by, and complied with, Article 3881e, known as Texas Commercial Feed Control Act of 1957, Sections 5 and 6. This law requires that feeds such as Full-O-Pep be accompanied by a tag showing, among other things, the guaranteed analysis and the common and usual name of each ingredient used in the feed covered by such tags. The law prescribes penalties for failure to furnish tags listing the information required.

The joint participation of appellants in the experimental feeding of the competitive company's feed removed these two feed tags from the realm of hearsay.

In addition, these feed tags are as much "official" labels as was the baseball guide that this Court held to be admissible for the purpose of showing the beginning and the end of playing season of a particular club, in Western Union Telegraph Co. v. Eckhardt, Tex.Civ.App., 2 S.W.2d 505,

modified, Tex.Comm.App., 11 S.W.2d 777, rehearing denied, 20 S.W.2d 759; and as the railway time tables held admissible in Western Union Telegraph Co. v. Gilliland, 61 Tex.Civ.App. 185, 130 S.W. 212, error refused.

## XII.

Appellants' forty-ninth point of error is that of the trial court in permitting plaintiff to testify to certain representations allegedly made to him by defendants' representatives regarding the quality of turkey feed produced by defendants over their objection that any warranty regarding the quality of said feed was contained in the written contracts executed in connection with each purchase of such feed and that prior negotiations were merged in such written contracts.

We overrule this point.

Pursuant to the business arrangement between the parties, appellee and appellants entered into a similar but separate turkey feed purchase contract each and every time appellee purchased turkey feed from appellants. Each such contract executed by the parties contained a clause with the following language:

> "2. Terms of this agreement may not be varied orally and no statement, act or representation as to quantity, quality, prices or terms shall be binding on either party unless included herein. No warranty is made with respect to results from use of any feed supplied under the terms of this agreement."

This clause was expressly referred to on the front of the contract.

The rule of strict liability is not affected by contractual considerations and a waiver or disclaimer of the implied warranty of fitness does not eliminate the strict liability that the law imposes. This is the rule applied in Vandermark v. Ford Motor Company, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 171 by the Supreme Court of

California. Vandermark concerned a mechanical defect in an automobile. A waiver of an implied warranty of wholesomeness of a food product was before the Court in Linn v. Radio Center Delicatessen, 169 Misc. 879, 9 N.Y.S.2d 110. The Court held that the waiver was not effective to release the manufacturer from strict liability based upon implied warranty of wholesomeness of the pastry and that it would be contrary to public policy to hold otherwise.

■ There is still another reason why the disclaimer on the back of the contract is ineffective here. A sale of unfit feed is a violation of the penal provisions of the Texas Commercial Feed Control Act of 1957 cited above. Anticipatory releases of liability for violation of penal statutes are uniformly held to be invalid. Cameron Compress Co. v. Whitington, Tex.Comm. App., 280 S.W. 527.

The cases cited by appellants are not in point here as they involve express warranties in contract cases.

### XIII.

■ Appellants' fiftieth point of error is that of the trial court in including in the judgment in plaintiff's favor interest from January 15, 1964, on the amount found by the jury as his damages, said date being approximately twenty (20) months prior to the date on which the judgment was rendered, because in no event should any interest have been allowed except from the date of judgment.

We overrule this point.

■ All of the losses in this case occurred in 1963, the last flock of turkeys having gone to market on January 2nd or 3rd, 1964. The trial court allowed interest from January 15, 1964. We hold that appellee was entitled to interest prior to judgment under authority of the Supreme Court in Watkins v. Junker, 90 Tex. 584, 40 S.W. 11, where the rule was announced that compensation for detention of that

which is due on account of injury inflicted is an element of damages necessary to the complete indemnity of the injured party. The rationale of awarding interest prior to judgment is to provide complete indemnity for the injured party.

### XIV.

Appellants' fifty-first point of error is that since it appeared from plaintiff's own income tax returns for prior years that he had never cleared as much as $15,000.00 in any one year from his total operations, and since there is absolutely no warrant in the evidence for finding plaintiff would have made in excess of ten (10) times as much from his 1963 turkey crop as he had ever made at any time from all his operations, the verdict is grossly excessive, and the trial court erred in refusing to set aside the verdict of the jury and to grant defendants a new trial.

We overrule this point.

17 Tex.Jur.2d, page 407 in discussing damages, states:

"In passing on whether a verdict for damages is grossly excessive the evidence in support of the award must be viewed in the light most favorable to the award."

and further on pages 408–409 that:

"* * * unless the award is so large as to indicate that it was the result of passion, prejudice, partiality or corruption, or that the evidence had been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive, either by the trial court or on appeal."

■ The damage awards in this case are based entirely on detailed evidence carefully supported and documented on each element of damages answered by the jury. Appellants are not specific in pointing out which one or more of the answers to the seven damage questions are excessive and seem to base their contention on the fact that appellee's operations in the past have been on a smaller scale. This latter fact

has no bearing on appellee's turkey operation for the year 1963.

## XV.

Central Soya, Inc. moved for judgment non obstante veredicto which the court properly overruled.

The judgment is joint and several against both appellants.

The evidence discloses that McMillan is a wholly-owned subsidiary of Central Soya. The evidence also discloses that these two appellants, acting in concert with one another, sold the turkey feeds in question to appellee.

 It is the general rule in Texas that two or more persons become joint tort feasors when they participate in concerted action to commit a common tort and accomplish their purpose. 55 Tex.Jur.2d Sec. 13, page 636.

We affirm the judgment of the trial court.

Affirmed.