**The CITY OF TYLER, Texas, Appellant,**

v.

**FOWLER FURNITURE COMPANY, INC., Appellee.**

**No. 12–90–00181–CV.**

Court of Appeals of Texas, Tyler.

May 6, 1992.

Rehearing Denied June 2, 1992.

John M. Smith, Longview, for appellant.

Hugo Schmidt, Tyler, for appellee.

JACKSON B. SMITH, Jr., Retired Justice.[1]

Appellee, Fowler Furniture Company, filed this suit against the City of Tyler, Appellant, alleging negligence by the city in not properly maintaining or repairing an existing storm drainage system, and failing to provide or maintain adequate barriers along or around that system. The city asserted governmental immunity and denied any negligence. The trial court held, as a matter of law, that the city did not have governmental immunity, and based on jury findings of negligence, causation, and damages, the trial court entered judgment for Fowler Furniture in the sum of $458,760, and prejudgment interest of $184,670.

The undisputed facts show that in the early morning hours of April 5, 1986, the City of Tyler experienced a heavy rainfall wherein it received between 5.52 and 6.67 inches of rain in various parts of the city. Flooding occurred, and the Fowler Furniture Company was inundated. During this same period of time, two automobiles were washed into an open culvert in the city's existing storm drainage system.

The storm drainage system had been in existence for 40 to 50 years in 1986, when the incident made the basis of this suit occurred. Originally, the system had been a rock-lined creek. During those 40 to 50 years, structures, including Fowler Furniture, had been built over the system so that the system had become intermittently underground (box culvert) in some places and open in other places such as the open culvert in which the two automobiles had come to rest. The system and open culvert involved afforded drainage for the streets and surrounding area in which Fowler Furniture was located.

In September 1981, the City had a heavy rainfall of 3.2 inches. During that rainfall, flooding had occurred, and an automobile had washed into the same open culvert that is involved in the present suit.

After the 1981 rainfall incident, Tyler assistant city engineer, Dr. Keith Williams, notified the city of the problems and dangers of the open culvert. He recommended that guard posts or railings be installed to prevent automobiles or other debris from being washed into the open culvert storm drainage system. The cost to install the posts or railings would have been a few hundred dollars. No action was taken on Dr. Williams' recommendation.

The facts concerning what caused the 1986 flood at Fowler Furniture and the amount of damages sustained by Fowler Furniture as a result of the flooding were disputed, hotly contested, and were submitted to the jury for resolution.

■ In its first point of error, the City asserts that the trial court erred in denying its motion for partial directed verdict because the City's alleged negligence in failing to provide or maintain adequate barriers along and around the existing storm drainage system involves a governmental function and the city is immune from liability when acting in its governmental capacity.

It has long been established that a municipal corporation functions in a dual capacity. At times, it functions in its proprietary capacity as a private corporation, and at other times, it functions as an arm of the government. *Dilley v. City of Houston*, 148 Tex. 191, 222 S.W.2d 992, 993 (1949).

In *Dilley*, the Texas Supreme Court enunciated two basic rules to determine the liability or non-liability of a municipality for its actions:

(1) When a municipal corporation acts in its private capacity, for the benefit only of those within its corporate limits, and

---

1. The panel before whom this cause was submitted consisted of T.C. Chadick, retired chief justice, Court of Appeals, Sixth District of Texas at Texarkana. Honorable Gerald T. Bissett, retired justice, Court of Appeals, Thirteenth District of Texas at Corpus Christi. Honorable

Jackson B. Smith, Jr., retired justice, Court of Appeals, First District of Texas at Houston, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

not as an arm of the government, it is liable for the negligence of its representative. (citations omitted)

(2) A municipal corporation is not liable for the negligence of its agents and employees in the performance of purely governmental matters solely for the public benefit. (citations omitted)

*Id.*

Furthermore, in *Dilley*, the Supreme Court reaffirmed its prior holding that the construction, operation, and maintenance of a storm sewer by a city is not a purely governmental function. *See City of Amarillo v. Ware*, 120 Tex. 456, 40 S.W.2d 57, 60 (Tex.Comm'n App.1931, opinion adopted).

The City of Tyler *maintains* that the word *"maintain,"* as used in Special Issue No. 1 submitted to the jury, means "keep in a state of repair." The foregoing sentence is an example of how the meaning of the word "maintain" varies, depending on the context in which it is used. Our reference dictionary lists numerous definitions for the word maintain, one of which is "to provide for." *See* Websters Third Int'l Dictionary (1976 ed.). As a definition of the word "maintain," was not given in the charge to the jury, an examination of Special Issue No. 1 is necessary to determine the meaning of the word "maintain" as used therein.

*Special Issue No. 1*

Do you find from a preponderance of the evidence that the City of Tyler was negligent in regard to the following:

I. Failing, if it did, to properly maintain and/or repair the existing storm drainage system serving the area where Fowler Furniture Company, Inc.'s business was located;

II. Failing, if it did, to provide or maintain adequate barriers along and around the existing storm drainage system at the arch culvert at or near the intersection of Elm and Fannin Streets at the railroad crossing;

(I) Answer: Maintain/Repair <u>No</u>

(II) Answer: Barriers <u>Yes</u>

We note that the word "maintain" is used in both questions submitted to the jury. In the first question, the word "maintain" is used in this context, "maintain and/or repair." In the second question, the word "maintain" is used in the context as follows: "to provide or maintain." In the first question, it appears that the jury, when considering the phrase "maintain and/or repair," agreed with the City of Tyler's position; that is how can a city maintain or repair barriers that are not in existence. Thus, when the words maintain and repair were associated, the jury found the city not negligent. It appears that in this context, the jury considered maintained to mean "keep in a state of repair."

It also appears that when the word "maintain" was associated with the word "provide" in the second question, the jury considered the word "maintain" to mean to "provide," and the jury found that the city was negligent.

We find nothing inconsistent or conflicting in the jury's answers when considering how the word "maintain" was used in each of the questions.

As heretofore stated, the evidence shows that the storm drainage system had been in existence for 40 to 50 years. During this period, it had changed, by various modifications and improvements, from a rock-lined creek bed, to a partially enclosed underground system. We find nothing in the evidence that would require the city council of Tyler to act in its governmental capacity to install guard posts or railings to prevent debris from washing into the open culvert. To the contrary, it is manifest that barriers could have been put in place by private subcontractors.

The cases the City of Tyler cites to support its position of governmental immunity are distinguishable. The decisions in those cases were based on discretionary actions that only a governmental unit could perform: *City of Round Rock v. Smith*, 687 S.W.2d 300, 303 (Tex.1985) (approval of a subdivision plat); *City of El Paso v. Ayoub*, 787 S.W.2d 553, 554 (Tex.App.—El Paso 1990, writ denied) (approval of design of roads and bridges), *City of Watuga v.*

*Taylor*, 752 S.W.2d 199, 202 (Tex.App.— Fort Worth 1988, no writ) (approval of bridge construction and failure to cause drainage improvements).

We find that the decision to install or not to install barriers in front of the open culvert in its storm drainage system was a proprietary function of the City of Tyler. We hold that the trial court properly denied the City of Tyler's motion for partial summary judgment based on its assertion of governmental immunity from Appellee's claims. The City of Tyler's first point of error is overruled.

The City of Tyler, in its second through fifth points of error, alleges that the trial court erred in overruling the City's motion for judgment non obstante veredicto and its motion for new trial because there was no evidence or insufficient evidence to support the jury's answers that the city was negligent in failing to provide or maintain adequate barriers along and around the existing storm drainage system and that the City's negligence proximately caused damages to the plaintiff.

Since 1951, the Texas Supreme Court has consistently held that in considering no evidence points of error, the appellate court is to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary. *McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex.1985); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). Likewise, the court has consistently held that a court of appeals is required to consider all the evidence in the case in considering insufficiency of evidence points of error.

Basically, the City of Tyler contends that the flooding was not caused by the two automobiles blocking the drainage into the open culvert, but was a result of extremely heavy rains during a short period of time. In other words, the flooding resulted from "an act of God." The City asserts that there is no evidence or insufficient evidence to refute its theory of what caused the flooding and that it was not negligent in any respect.

Two City of Tyler police officers testified that they were on patrol duty on April 4–5, 1986. Each officer testified that the rain commenced about 4:30 a.m., and subsided around 6:00 a.m. Both officers testified that it rained hard, and one of the officers, Sergeant Gary Rice, testified that he had never seen it rain that hard in the Fowler Furniture store area.

Charles Thomas, Tyler's city engineer, testified that it would take approximately two feet of surface water to float an automobile into the open arch culvert involved in the instant case. He testified that there had been other rains in Tyler when as much or more rainfall had been recorded but no flooding had occurred. He explained that the intensity of the rain and the length of time that it had rained were the determining factors in why no flooding had occurred during other heavy rainfalls in Tyler.

He further testified that the cars washing into the open culvert would have no effect in causing the water to flood Fowler Furniture. He explained that cars in the culvert would create a damming effect on the surface water and would slow down the water as it progressed downhill toward Fowler Furniture. He said he doubted that the April 5 rainfall was a 100–year rainfall.

Richard Robertson, who has a doctoral degree in engineering, testified as an expert witness for the City of Tyler. He testified that he was retained by the City to evaluate the flood that occurred on April 5, 1986, at Fowler Furniture. He said his evaluation was based on a study by Brannon Corporation for the City, city records, city employee's investigation of the event, eye witnesses, and newspaper accounts. He also said that he had been to the area where the flood occurred to make his own personal observations.

From all this information, he concluded that about 6 inches of rain had fallen. He then applied this information to the time period in which the rain had fallen and concluded that the rainfall was "well in excess—way beyond what we would con-

sider a 100–year storm event, for that drainage basin for that period of time."

Doctor Robertson's testimony agreed with that of Charles Foster in that the two cars going into the open culvert would have no effect on the flooding condition that occurred at Fowler Furniture. He also stated that he was not present during the April 1986 rainfall and that his conclusions were based on the fact of a six-inch rain in a 35–minute period.

The basic factual difference between the respective theories of Fowler Furniture Company and Dr. Robertson is the time period in which the rain fell; that is, five to six hours as opposed to 35 minutes.

To support its theory that the rain fell over a period of five or six hours, Fowler Furniture Company offered the testimony of Margaret Bennett. Mrs. Bennett was a night clerk at the Tyson House, a retirement home. She worked from 11:00 p.m. to 7:30 a.m. each day. She testified that Fowler Furniture and the Tyson House are both on Erwin Street but Fowler Furniture is across the street and east of the Tyson House.

She stated that on the night of April 4–5, she left home a little earlier than 11:00 p.m. because of the rain. She testified that it was raining heavy and described how the streets were flooding and how she observed other cars stalling out. Upon arriving at work about 11:30 p.m., she phoned her husband to assure him that she had made it to work safely. She said it rained all night and about 4:30 a.m., she opened some drapes to see the outside conditions. She testified that when she saw water over the street curb and almost to the front door of the Tyson House, she phoned her administrator to tell her what was happening. During their phone conversation, a male resident of the Tyson House came downstairs to the office and Mrs. Bennett let him talk to the administrator. About this time, 4:45 a.m., water broke through the back door of the Tyson House. Shortly thereafter, water broke through the front door and Mrs. Bennett and the resident struggled through the rushing water to get to the staircase. She said they had to climb three stairs to get out of the water which was about three and one-half feet deep. She recalled that the water receded about 45 minutes later.

Mrs. Bennett stated that she had worked at the Tyson House since 1980. She recalled that the Tyson House had flooded on only one occasion while she was working there and that was in 1981. She could not recall in what month in 1981 the other flood had occurred.

Fowler Furniture offered into evidence measurements of rainfall in the City of Tyler as recorded by Dr. Bob Peters, a meteorologist, for the period from 1947 through 1987. The City admitted Dr. Peters' records were reliable.

Dr. Peters' records were all based on 24–hour period measurements. They showed a rainfall on April 5, 1986, of 5.42 inches. On September 1, 1981, the date on which the first car had washed into the open culvert, Dr. Peters' records show a rainfall of 2.31 inches. His records also show that between September 1973 and October 1986, the City of Tyler had five rainfalls that were recorded as 5.47 to 9.02 inches of rain in a 24–hour period. These five rainfalls all exceeded the 5.42–inch rainfall of April 5, 1986.

Jeff Miller, an architect, testified that on April 5, 1986, he inspected the Fowler Furniture premises. He stated the weight of the flood waters had caused the floor and sub-structures to break downward. He inferred that this would not occur if the water had simply been slowly rising.

Miller related that approximately five weeks after the April 5 flood, Tyler had a 3.38–inch rain in about one hour and 45 minutes. He said that he had gone to Fowler Furniture during that rain and viewed the storm drainage system under the store. In his opinion, the system was never over one-half full.

Mr. Harold Fowler, president and owner of Fowler Furniture Company, Inc., testified that he had a civil engineering degree and had extensive engineering experience. He stated that he had maintained his license as a professional civil engineer. He

recalled that he had worked with his father and then by himself at Fowler Furniture for 45 years. He stated that during this period, he could recall only two floods. The first of those floods was in 1981 when a car washed into the same open culvert involved in the present case. He said the Tyson House flooded on that occasion. The second flood was the April 5, 1986, flood at issue here, when two cars washed into that same culvert. He said that on that occasion, both the Tyson House and Fowler Furniture flooded. He stated that the April 5, 1986, flood was the only time that Fowler Furniture had ever flooded.

Mr. Fowler also testified that on the morning after the 1986 flood, he arrived at the store between 6:00 a.m. and 6:15 a.m. He then described and detailed the extensive damage to the merchandise, the store's structure and its sub-structure. He told how the water flowed down toward Fowler Furniture from the higher elevations, and how he had walked upstream through and under the storm drainage system after the flood. He said he found a large tree in one of the box culverts upstream.

Fowler was of the opinion that the 1981 and 1986 floods were caused by the automobiles which washed into the open-arched culvert and blocked it to the extent that water could not enter the system and flooded the street. He estimated that the blockage of the system in 1986 was as much as 80%.

Fowler's theory of what occurred in the 1986 flood was that water pooled upstream near a fire station, then had to flow downstream where it had to flow through an underpass which built up the water, which greatly increased its pressure and velocity as it passed out the other side. He compared this to how water pressure builds up behind a waterhose nozzle. Because the flooding water could not enter into the blocked open arch culvert, he was of the opinion that the water flowed with great pressure and velocity until it flooded the Fowler Furniture store.

He concluded that if the City of Tyler had placed barriers in front of the open arch culvert in the city's storm drainage system, as it had been alerted to do in 1981, the two cars would not have washed into the culvert, and the 1986 flooding in his store would not have occurred.

The record in this case is approximately 700 pages and we have not attempted to set forth in this opinion all the evidence pertaining to the four points of error under consideration. However, we have included the evidence that tends to substantiate the theory of each party.

That uncontested evidence shows that in 1986, the City of Tyler did not have a master storm drainage system plan; that in 1981, the city was alerted to the dangerous condition that existed at the open arch culvert in its storm drainage system and that it failed to act on its own engineer's recommendation. The evidence also shows that the only times flooding occurred in this area were in 1981 and 1986 when cars washed into the same open culvert.

We are of the opinion that the above evidence constituted sufficient evidence to support the jury's finding that the City of Tyler was negligent in failing to provide or maintain adequate barriers at the open arch culvert.

■ The next question is whether there is sufficient evidence to support the jury's finding that the failure to install a barrier was the proximate cause for the flood that damaged the Fowler Furniture property.

Dr. Robertson's whole theory was based on his conclusion that six inches of rain fell within approximately 35 minutes. He agreed that if these facts were not what actually occurred, then his conclusions were not valid.

Mrs. Bennett, who was present throughout the rain, testified that it was raining at 11:00 p.m. and still raining at 4:45 a.m., a period of five to six hours. It is apparent that the jury gave more credence to the testimony of Mrs. Bennett, who was actually present during the rainfall, than it did to Dr. Robertson's testimony.

It is the jury's prerogative to determine the credibility of the witnesses. If the jury believed Mrs. Bennett's testimony that the rain lasted five or more hours, it had the

right not to believe Dr. Robertson's testimony that the six inches of rain fell in 35 minutes. It also had the right to accept Dr. Robertson's testimony that if his factual conclusions were incorrect, then his conclusions of what caused the flood were not valid.

We are of the opinion that there was sufficient evidence to support the jury's findings that the City's negligence in failing to install the barriers in front of the open arch culvert was the proximate cause of the flooding at Fowler Furniture.

We hold that the evidence was sufficient to support the jury's findings, and that the trial court properly overruled the City of Tyler's motion for judgment non obstante veredicto and motion for new trial.

The City of Tyler's points of error two, three, four, and five are overruled.

■ In its point of error six, the City of Tyler contends that the trial court erred in overruling its motion for judgment non obstante veredicto because the barriers which Fowler Furniture claims should have been provided would have been on private property and a city has no duty requiring it to exercise its 'power of eminent domain. We find no merit to this contention.

The particular part of the city's storm drainage system involved in this case had been in existence in excess of 40 years. The city had enacted ordinances which permitted it to go on private property to maintain its storm drainage system. The property on which the open arch culvert is located is owned by a railroad, but it had been inspected for debris and foreign matter by the city for years. It is undisputed that the city had the right to go on, and did go on this property to inspect the culvert before and after the flood on April 4–5. The City cites us to no cases that would prevent it from placing barriers around its own storm drainage system to protect the public from a dangerous or perilous area.

■ The City's duty in the present case is analogous to its duty to erect barricades on a street where hazardous or dangerous conditions exist. The erection of barricades on a city street is a proprietary func-

tion of the city. *Jezek v. City of Midland,* 605 S.W.2d 544, 546 (Tex.1980). Likewise, we have held in this case that the erection of barricades around an open arch culvert in a city storm drainage system was a proprietary function of the city.

■ When a city is given notice of or alerted to the fact that a dangerous condition exists on one of its streets, it has a duty to warn of the danger or, if necessary, make safe the defective condition. *Id.* at 548. Furthermore, if a landowner permits the public use of his land as a highway, this is evidence of his intention to dedicate. *Dunn v. Deussen,* 268 S.W.2d 266, 268 (Tex.Civ.App.—Fort Worth 1954, writ ref'd n.r.e.).

We perceive no reason why the same sound reasoning used in *Jezek* and *Dunn* should not be applied to another proprietary function of a city, that is, its storm drainage system.

We hold that when a city has a storm drainage system and is placed on notice of a hazardous condition in its system, the city has the duty and responsibility to alleviate or eliminate the hazardous condition, even if it has to go on to private property located within its system to correct the hazardous condition.

The City of Tyler's point of error six is overruled.

■ The City of Tyler, in its point of error seven, alleges that the trial court erred in awarding damages to Fowler Furniture Company because there was no evidence or insufficient evidence to support the jury's damage findings.

Specifically, the City complains about the jury's findings on (1) lost profits on inventory, (2) lost profits on sales, and (3) decline in business value.

Mr. Fowler testified at length how on the morning after the flood he and other store employees went into the city's storm drainage system in an attempt to recover whatever they could. He said they recovered very little as most of it had been smashed to "smithereens." He said because of the extensive damage to the building and in-

ventory, business could not be conducted and the store was closed.

As to his losses, Mr. Fowler stated that temporary repairs to the building cost $73,300 and later additional repairs cost $104,874. He said $16,760 of equipment and supplies were destroyed. In his opinion, after all repairs on the building had been made, the building was still not in as good a condition as it had been before the flood. Mr. Fowler testified that after the store reopened, business "went rather badly." He stated that the store did a lot of advertising but to no avail, and finally, after several months, the entire inventory had to be sold. He computed his total loss at $710,934.

Mr. Brian Scott, a licensed real estate broker and appraiser, testified as an expert for Fowler Furniture. He testified as to his familiarity with the Fowler Furniture Company building before and after the flood. He was of the opinion that even after the flood-damaged building had been repaired, the value of the building had diminished $50,000.

Mr. Richard Perryman, a certified public accountant, who had the Fowler Furniture Company account for many years prior to the 1986 flood, testified on behalf of Fowler Furniture Company. He stated that he prepared the Fowler Furniture Company's income tax reports and worked on the store account from 1970 to the late "70's" and then from 1980 to the time of the April 1986 flood.

He testified that the store fiscal year was April 1 through March 31. He stated that because the fiscal year had ended on March 31, just prior to the store being flooded on April 5, 1986, it was easier for him to give his opinion of the damage to the store. He admitted that as a CPA, he was not permitted to make physical projections, however, he stated that as a CPA he could give his expert opinion on losses based on the records he had kept for the store and upon his knowledge of the affairs of the store accumulated over the years. He stated he used accepted accounting principles, in arriving at his final calculations as to the store's losses.

Perryman then explained, step-by-step, how he computed the furniture store's losses. The primary basis for his calculations were the store's income tax returns from the prior years. He stated that these returns were signed by his accounting firm but were not certified. He explained that a certification of a return would have required a complete audit of the inventory and every transaction of the store for that fiscal year. He said that the store's tax returns had been prepared each year on the figures and other data supplied by Mr. Fowler. He stated that he had never found any irregularities in the facts and figures supplied to him by Mr. Fowler for the preparation of the store's tax returns and that if he, or any member of his firm had noted any irregularities, the firm would not have prepared or signed a tax return for the store.

Mr. Perryman's opinion was that the Fowler Furniture store sustained the following losses:

(1) lost profits on inventory—$198,797;

(2) loss on profits of lost sales—$71,247;

(3) decline in business value—$167,956.

The City of Tyler asserts that Perryman's computations are not valid because they are based on data furnished by Mr. Fowler and not on an audit by Mr. Perryman's accounting firm. The City alleges that Perryman's calculations were based on mere guesses and speculation and constitute no evidence, or at least insufficient evidence to support the jury findings in the court's final judgment. We disagree.

Perryman's computations were not based just upon a form tax return, but also upon supporting evidence such as balance sheets and profit and loss statements. In his testimony, he noted the consistency of the store's statements and its growth.

The City of Tyler introduced Fowler Furniture corporate income tax returns for the years ending 1981 through 1988. These returns were not only one basis for Perryman's testimony but were also evidence of the truth of the underlying preparation information furnished to Perryman by Fowler. Each tax return, above the signer's

signature, states "under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct and complete." This declaration on each return was evidence the jury could consider in determining whether the signer of the return was giving Perryman truthful information to put into the tax return.

Fowler's and Scott's testimony were some evidence of the losses the store sustained, but Perryman's detailed explanation of how he computed the store's losses was much more methodical and thorough. The jury findings of the store's losses were almost exactly the same as Perryman's. We hold that there was sufficient evidence to support the jury findings on lost profits on inventory, lost profits on sales, and decline in business value.

The City of Tyler's seventh point of error is overruled.

■ In its point of error eight, the City of Tyler alleges that the trial court erred in overruling the City's motions for judgment non obstante veredicto and new trial because the claim of Fowler Furniture for damages on interest on borrowed funds is an improper element of damages and is not recognized by Texas law.

The City's complaint is directed to Special Issue No. 3(6) which inquired whether Fowler Furniture Company had sustained damages as a result of having to borrow money to make repairs and pay interest on the loans. The jury found that Fowler Furniture had been damaged to the extent of $20,760 for interest it had paid on these borrowed funds.

The City's complaint is two-fold. It asserts that the interest on the borrowed money is not a proper element of damages. It then asserts that the allowance of such interest on the loan and then the allowance of prejudgment interest on such award is in effect permitting a double recovery on the same element of damage.

The City concedes that if Fowler is due a recovery, prejudgment interest can be awarded. Both parties cite *Cavnar v.* *Quality Control Parking Company, Inc.,* 696 S.W.2d 549 (Tex.1985), as controlling.

The first question necessary for us to answer is, whether interest on borrowed funds is a proper element of damages. Mr. Perryman testified that the charging of interest on borrowed funds is a real and existing element of damage and loss to the corporation. He calculated the interest on the borrowed funds to be about $20,700. He stated earlier in his testimony that he used accepted accounting methods in all his computations.

It appears to be a well accepted fact that where business has to borrow money, the interest charged on such loan is a legitimate expense. The rationale in awarding damages is to provide complete indemnity to the injured party. This same rationale is applicable to the award of prejudgment interest. *McMillen Feeds, Inc. of Texas v. Harlow,* 405 S.W.2d 123, 138 (Tex.Civ. App.—Austin 1966, writ ref'd n.r.e.).

We are of the opinion that Fowler Furniture sustained a monetary loss when it paid interest on money it had to borrow to make repairs and to replace its inventory and office equipment. The April 5, 1986, flood caused this loss. We hold that the payment of interest on borrowed funds to repair or replace damaged property where such damage is caused by the negligence of a defendant, is a proper element of damages.

■ The City also alleges that the trial court's award of prejudgment interest from October 5, 1986, through February 5, 1990, in addition to the award of interest on the loan allows a double recovery of interest on the same element of damage. We agree, but only to a limited extent.

Perryman computed interest on the loan for the period from April 5, 1986, through August 31, 1987. The court awarded prejudgment interest on all damages for the period October 5, 1986, through February 5, 1990. Thus, for the period October 5, 1986 through August 31, 1987, a double recovery of interest on the loan was incorporated into the trial court's computation of prejudgment interest.

We hold that the trial court should have awarded prejudgment interest on all damages except interest on borrowed funds, from April 5, 1986, to February 5, 1990. It should have awarded prejudgment interest on the $20,760 award for interest on borrowed funds from September 1, 1987, to February 5, 1990. This error in the computation on prejudgment interest requires us to remand this case to the trial court to recompute and make proper entry of the amount of prejudgment interest and the total amount of damages awarded in its final judgment.

The City of Tyler's point of error eight is sustained in part and overruled in part.

The judgment of the trial court is remanded to that court with instructions to enter the proper amount of prejudgment interest and total damages in its final judgment. In all other respects, the judgment of the trial court is affirmed.