**GULF BITULITHIC COMPANY,**
Appellant,

v.

**R. T. HERRIN PETROLEUM TRANSPORT COMPANY, Appellee.**

No. 15131.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Jan. 18, 1968.

Vinson, Elkins, Weems & Searls, B. Jeff Crane, Jr., Raybourne Thompson, Jr., Houston, for appellant.

John L. McConn, Jr., Howard L. Nations, Houston, Butler, Binion, Rice, Cook & Knapp, Houston, of counsel, for appellee.

COLEMAN, Justice.

This is a suit for property damages resulting from a fire allegedly caused by the negligence of appellant. The trial court entered a judgment for appellee, plaintiff in the trial court, based on a jury verdict. The principal questions presented by this appeal relate to the sufficiency of the evidence to support the verdict of the jury.

On October 18, 1963, an R. T. Herrin Petroleum Transport truck driven by Domingo Lopez Baragan carried gasoline to

the Gulf Bitulithic yard near Columbus, Texas. Upon arriving at the yard, he was directed to place his truck parallel to a gasoline storage tank and between it and a diesel fuel tank. After parking his truck as directed, he connected his two-inch hose with the storage tank by placing the nozzle of the hose in a three-inch opening located about 16 inches from the front of the storage tank and securing it with wire. He then started his truck motor and activated a power takeoff which pumped the gasoline from the tank truck into the storage tank.

Before the entire load of gasoline was transferred to the storage tank, it overflowed. When Baragan noticed this, he stopped the motor, but about ten gallons of the gasoline had spilled. He reported to appellant's foreman, John Calvin Dixon, that the storage tank had overflowed and that he had about fifteen more gallons to deliver. (At another time Baragan testified that about fifty gallons remained) Dixon directed Ruben Caldwell, another of appellant's employees, to draw gasoline out of the storage tank. A gasoline pump, somewhat similar to those found in filling stations, was located a foot or two from the front of the storage tank. It was connected to the bottom of the tank by a pipe, and was equipped with a hose and nozzle similar to those found on service station pumps. Power to operate the pump was provided by a gasoline engine, similar to a lawnmower engine, located at the side of the pump. The motor was started by use of a pull cord, and was stopped by grounding the spark plug located on the top of the motor with a metal lever, or by removing a wire to the spark plug.

Caldwell started the motor and filled the gasoline tanks of several trucks as they were driven up for that purpose. In excess of fifty gallons of gasoline were removed from the tank. As he began filling some five gallon cans, Baragan started pumping gasoline into the tank again. As the last of the gasoline was pumped out of the truck tank, it blew air and some gasoline came out of the opening through which the storage tank was being filled. A short time after that a fire started at the gasoline engine, causing the damage to the trailer and gasoline tank, to recover which this suit was brought.

The jury found that (1) just before the occurrence of the fire in question, Ruben Caldwell moved the hose nozzle in such close proximity to the gasoline engine mounted on the storage tank that drippings from the nozzle could strike said engine; that (1A) gasoline drippings from the hose nozzle fell on the gasoline engine mounted on the storage tank; that (2) such moving of the hose nozzle was negligence; and that (3) such negligence was a proximate cause of the fire in question.

The jury also found that Baragan warned Caldwell that he was resuming pumping and that he was not negligent in pumping gasoline into the storage tank while Caldwell was pumping gasoline out of it.

There was testimony that the gasoline motor was not covered while it was being operated, and that the exposed manifold would become hot enough to ignite gasoline spilled on it. There was also testimony that gasoline "more than likely" would be ignited if it hit the hot motor and vaporized and contacted a spark.

Ruben Caldwell testified that he was standing near the engine and was reaching to stop the motor when the explosion happened. He testified that he had dropped the gasoline hose and that no gasoline came out of the nozzle after he dropped it. He said he didn't squirt any gasoline on the engine with the nozzle. He testified that he turned toward the engine when he saw Baragan running away while screaming: "Cut it off!" He saw gas just piling up out of a little pipe on top of the tank. It went twelve feet in the air and sprayed him. Before he could turn the engine off, there was an explosion. He received burns, the most severe being to his right hand. His shirt did not burn. He started running down the road. On a prior deposition

he had testified that the gasoline was going at least two feet in the air and falling like spray. He also testified that it was after he saw Baragan running away that the fire started. His testimony was impeached to some extent in other respects by use of his prior deposition. In his deposition he also testified that the nozzle he was using was the same type used in service stations, and that after the lever on the nozzle was released drippings would come out.

Baragan testified that after he started his diesel engine the second time, he climbed up on top of the truck tank to watch it drain out. He saw it empty and his pump "blowed" air and some gasoline "bubbled" out of the storage tank. It barely came up and ran down the sides of the tank. This happened just before the fire. When the last compartment of the tank emptied, he got off of the truck and got in the cab. He stopped the truck engine and power takeoff and told Caldwell that he was through, as he reached for his clipboard. Caldwell turned around and looked at him. That was when the fire started. He was sitting in the cab of the truck and fire came through the window and burned his face. He got out and ran.

While he was sitting in the cab he saw Caldwell filling some cans with gasoline. When he turned toward him, he was also turning toward the gasoline pump, and he had the gasoline hose nozzle in his hand. The fire started when Caldwell turned.

Mr. Vackar, an employee of appellant, testified that he drove a pickup to get gas a short time before the fire and didn't see any signs that the tank had overflowed. While he could smell gasoline, the odor of gasoline was always present from "drippings on the ground." "You always had your drippings off your nozzle."

Mr. George Orange testified that he was working about three hundred feet from the tank when the fire started. He saw the tank overflow the first time, but could not tell how much spilled. He saw the driver go and talk to Dixon, and then saw two men drive in a pickup truck to the storage tank. In a few minutes, roughly ten or fifteen minutes, the fire broke out. He saw two men run from it. When he first saw them they were running in the road about twenty feet from the tank and Ruben Caldwell was ahead. He didn't see any gas spilling over at the time the fire "broke out." He knew that both Caldwell and the Herrin driver were burned by the fire. The driver was burned on the left side of his face and his ear. There was a breeze, but not a strong wind, and it was blowing away from the front of the tank.

There is direct evidence that the fire started at the gasoline engine, but there is no direct evidence as to the cause of the fire. The jury's verdict necessarily rests on inferences drawn from the evidence. The jury necessarily believed that the fire resulted from the ignition of gasoline fumes by the gasoline engine. There is no evidence pointing to an alternative theory. There is direct evidence that gasoline fumes were in the vicinity of the engine; that the manifold will become hot enough to ignite gasoline fumes; that the spark plug was unprotected and had electricity going through it, and that "that electricity can start gasoline burning if it gets on there"; that the engine had been running 10 to 15 minutes; that under such circumstances fire will result. The inference that the fire resulted from the ignition of gasoline fumes by the engine was a permissible one. McMillen Feeds, Inc. of Texas v. Harlow, 405 S.W.2d 123 (Tex.Civ.App., Austin, 1966, ref., n. r. e.); Republic Ins. Co. v. Inverness Estates, 252 S.W.2d 251 (Tex.Civ. App., Ft. Worth, 1952, error ref.).

The jury found that the source of the gasoline fumes ignited by the engine was the drippings from the hose nozzle. The evidence presents other possible sources for gasoline fumes: (1) the ten gallons spilled some time before the fire; (2) the gasoline spilled when the pump "blowed" air into the storage tank.

"When there is no direct evidence, and the proven circumstances are consistent

with either of two theories, and there is nothing to show that one rather than the other is correct, neither is proven * * *" Bonner v. Texas Co., 89 F.2d 291 (Cir.Ct. of App., 5th Cir.1937).

"Where circumstantial evidence is relied upon the testimony must establish circumstances to support the inferences drawn and these circumstances must be such as to make the truth of the fact proposition inferred more likely than not. * * * The same evidence may properly be the source of inferences as to the truth of several basic fact propositions. McDonald, Texas Civil Practice, § 11.28, pp. 1035–1036." Anchor Casualty Company v. Bowers, 385 S.W.2d 568 (Tex.Civ.App., Houston, 1965, rev'd on other grounds Tex., 393 S.W.2d 168).

" * * * The trial court may draw any reasonable inference from the evidence and any doubts as to the facts raised by the evidence will be resolved in favor of the judgment * * *" Republic Ins. Co. v. Inverness Estates, supra.

■ The jury is the judge of the credibility of the witnesses and of the weight to be given their testimony, and its determination in this regard will not be disturbed on appeal. Salmon v. Salmon, 406 S.W.2d 949 (Tex.Civ.App., Ft. Worth, 1966, ref., n. r. e.).

The first alternative mentioned above is the least likely immediate cause of the fire. A considerable time had elapsed after the ten gallons of gasoline had spilled before the gasoline engine was started. The prevailing breeze would tend to disperse the fumes and blow them away from the engine. The engine ran for ten to fifteen minutes before the fire. Vackar noticed no unusual smell of gasoline when his truck was filled. Caldwell apparently was not aware of a concentration of fumes since he did start the engine and remain there.

The jury apparently discounted the testimony of Caldwell, and accepted that of Baragan that when the air blew into the storage tank only a small amount of gasoline bubbled over and ran down the sides of the tank. In view of the testimony as to the prevailing breeze and the location of the motor with reference to the engine, the jury could have concluded that neither drops of gasoline nor gasoline fumes reached the engine from this source.

On the other hand the jury might have determined that gasoline reached the motor from testimony that drippings always remain in the hose nozzle after the flow of gasoline is shut off; that Caldwell had the nozzle in his right hand when he turned and came in close proximity to the engine; that the fire started just after he turned; and that his right hand was burned worse than other parts of his body.

Circumstances sufficient to support the inference that the fire was started when gasoline drippings from the hose nozzle hit the engine were established by direct evidence. The evidence is sufficient to meet the tests set out in the cases previously cited. The answers made by the jury to these issues are supported by substantial probative evidence and are not so against the great weight and preponderance of the evidence as to be clearly wrong. Fisher Const. Co. v. Riggs, 160 Tex. 23, 325 S.W.2d 126 (1959); Southland Life Ins. Co. v. Greenwade, 138 Tex. 450, 159 S.W.2d 854 (Tex. Com.App., 1942, opinion adopted); Salmon v. Salmon, 406 S.W.2d 949 (Tex.Civ.App., Ft. Worth, 1966, ref., n. r. e.).

In view of our disposition of these points of error, we consider it unnecessary to discuss the other points raised by appellant. The judgment of the Trial Court is supported by the verdict on the issues discussed.

The judgment of the Trial Court is affirmed.