**PURINA MILLS, INC. and Franklin County Feed & Supply, Inc. d/b/a Tri–County Feed & Supply, Appellants,**

v.

**Mike ODELL and Rose Odell, Appellees.**

No. 06–96–00066–CV.

Court of Appeals of Texas, Texarkana.

Submitted March 11, 1997.

Decided June 20, 1997.

Rehearing Overruled Aug. 5, 1997.

---

13. Tex. Gov't Code Ann. § 74.059(3) (Vernon Supp.1997)

14. 661 S.W.2d at 109.

Jim L. Flegle, Bracewell & Patterson, Dallas, Raymond R. Johnson, Sulpher Springs, for appellants.

Carl Bryan, Bryan & Mattison, Sulphur Springs, John R. Mercy, Atchley, Russell, Waldrop, Texarkana, for appellees.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

CORNELIUS, Chief Justice.

Purina Mills and Franklin County Feed & Supply appeal from a judgment based on a jury verdict finding them liable for damages to Mike Odell's 200–head dairy herd.[1] Odell alleged, under several different theories of recovery, that his herd was injured by consuming metal contaminated feed. The feed was manufactured by Purina and sold by Franklin County Feed & Supply. The jury awarded approximately $631,000.00 in damages for lost market value, lost past and future milk production, and mental anguish. The jury also awarded Odell attorney's fees of 33–1/3% of his total recovery.

Purina assigns twenty-four points of error. Because we find that the trial court erred in admitting the testimony of Odell's expert witnesses and that there is factually insufficient evidence to establish causation, we reverse the judgment of the trial court and remand the case for a new trial. We do not reach Purina's other contentions.

Mike Odell operates a dairy farm near Como, Texas. He has about 200 cows in his herd. Odell started dairy operations in November 1974. He originally fed his cows a complete feed mix, but after a few years installed a feed mill and started making his own mix meal. Odell mixed his own feed from 1975 until December 19, 1994. He did not have any problems with the quality of his mixed feed. As a precautionary measure, the finished feed was transported by a conveyor belt past a magnet so that bits of metal that might have gotten into the feed during the grinding process were removed before its final deposition in the feed tank.

Odell wanted to increase the milk production of his herd. Several friends told him they were seeing increased milk yields after switching to Purina feed. In December 1994, Odell decided to stop grinding his own mix and use a Purina feed mix. Odell received his first delivery of 20,000 pounds of straight pellet mix on December 19, 1994. Tri–County delivered the feed. About 16,000 pounds of the feed was placed in Odell's Number One tank, with the remainder placed in his secondary feed tanks. All future deliveries in excess of 16,000 pounds followed this procedure. The Number One tank delivered the feed directly to the barn, where it was fed to Odell's dairy cows. There was no magnet on the conveyor system transporting feed from the Number One tank to the barn. When the Number One tank was empty, Odell replenished the tank by transferring feed from the secondary tanks. The transferred feed passed over a magnet before it was put in the Number One tank.

Odell noticed that several cows became ill after eating the Purina feed. The herd's milk production also declined. Odell met with Tri–County representatives and told them about the problem. Rob Wagner, the manager of Tri–County, inspected Odell's operations in January 1995 and suggested changing the feed composition to a pellet and flaked corn mix. Odell saw an immediate increase in milk production.

Odell stopped checking the magnets on his feed delivery system when he switched to the Purina feed. At the end of April 1995, he checked the magnet and discovered Purina feed pellets adhering to the magnet. The pellets were contaminated with metal particles. Odell removed the feed pellets from the magnet, but did not inform Tri–County of his discovery. Odell testified that he thought the pellets might have accumulated on the magnet over several months.

On May 6, 1995, Odell took delivery of another load of Purina feed. He fed it to his herd. When the Number One tank was empty, Odell followed his usual procedure of replenishing it from the secondary feed tank. On May 13, 1995, Odell checked the magnet between the secondary feed tank and his Number One tank. He discovered Purina feed adhering to the magnet. The pellets were contaminated with metal particles, metal shavings, rust, pieces of wire, and staples. Odell removed the metal contaminated pellets and took them to Tri–County, where he informed Jim Brown and Rob Wagner of the problem. Jim Brown is a Purina representa-

---

1. Purina Mills, Inc. and Franklin County Feed & Supply, Inc. are different business entities but are represented by the same counsel. For convenience, appellants will be referred to as Purina.

tive. Brown and Wagner assured Odell that the contamination problem would be quickly resolved and that Purina would compensate him for any damages.

In May 1995, Odell received another load of Purina feed. He repeated the previously described process and, after transferring the feed between the tanks, discovered more metal contaminated Purina feed adhering to the magnet. He removed the metal contaminated feed pellets and took them to Tri-County Feed. Odell gave the sample to Jim Brown. Brown reassured Odell that the contamination problem would be resolved.

Shortly thereafter, Fred Bryant, general manager of Purina's Fort Worth manufacturing facility, contacted Odell. Bryant asked if Wagner and Brown could visit Odell's farm to collect a sample of the feed. Odell agreed. Wagner and Brown collected feed samples from the Number One tank. They also checked the magnet. They discovered more metal contaminated pellets. Wagner and Brown took possession of the pellets.

Sometime in May 1995, Dean McMahon and Roger Jones also met with Odell at his farm regarding the health problems of his cows. McMahon and Jones are Purina representatives and nutrition experts. Odell showed them several cows that had been diagnosed and treated for displaced abomasum.[2] McMahon felt that the hay Odell was using as forage for his herd might be the source of his problems and recommended that Odell procure a better quality hay.

On May 19, 1995, Odell accepted delivery of another load of feed. Odell repeated the previously described process and, once again, after transferring feed between the tanks, discovered metal contaminated feed pellets

adhering to the magnet. He removed the metal contaminated pellets. These pellets were admitted at trial as Plaintiffs' Exhibit #2. The sample contained feed pellets impregnated with metal particles, metal shavings, rust, staples, and a piece of wire. Odell contacted Tri-County and informed Wagner or Brown of the problem.

Odell received four more deliveries of Purina feed.[3] He followed the same routine as he had with previous deliveries. After feeding each load to his herd, Odell discovered that each had contained metal contaminated feed pellets. Odell stopped all deliveries in June 1995.

Odell said his cows started getting sick in the early part of 1995. Some of the sick cows were diagnosed with hardware disease[4] and others with displaced abomasum. The nature and extent of these injuries form the basis of this cause of action.

Purina contends in points ten through twelve that the trial court erred in overruling its motions to exclude or strike the testimony of Odell's veterinary experts, its motion for judgment non obstante veredicto, and its motion for new trial, because the plaintiffs' expert testimony was unreliable and inadmissible under the standard stated in *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995). In effect, Purina challenges the legal and factual sufficiency of the evidence supporting the jury's verdict. We agree that the expert testimony should have been excluded and that the evidence is factually insufficient.

■ The standard of review for assessing a trial court's decision to admit an expert's testimony or deny a motion for new trial is whether the court abused its discretion by

---

2. Displaced abomasum is a stomach ailment due to improper feed management practices. A cow's diet should be approximately 80% forage and 20% grain.

3. The seven loads of Purina feed weighed approximately 170,000 pounds.

4. Hardware disease is the common name for traumatic reticulo pericarditis. Cows can ingest metal. Once the metal is in the cow's reticulum (one of the cow's stomachs), it can pierce the stomach wall and migrate to the chest or abdominal cavities and damage other organs, such as

the heart, liver, or spleen. The metal may stop once it enters the cow's stomach wall. There are two forms of hardware disease-acute and chronic. The acute form is the most common and is generally caused by the ingestion of a large piece of metal. Symptoms are visible within two or three days of ingestion. The chronic form is slower to develop. There is no set time frame for the onset of symptoms. Symptoms can occur at any time after the cow's ingestion of the object. The time frame may be as long as two years. The onset of symptoms is dependent on the type of object ingested, its shape and size, and where it migrates.

acting without reference to guiding rules or principles. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 558; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). This determination is a question of law. *North Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90, 93–94 (Tex.App.-Dallas 1995, writ denied). A reviewing court cannot conclude that a trial court abused its discretion merely because it would have ruled differently. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 558.

The standard of review used to determine the validity of a trial court's granting or refusing a judgment notwithstanding the verdict is the same as that used for review of a "no evidence" claim. *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 728 (Tex.1982). A legal principle that prevents a party from prevailing on its claims justifies granting judgment notwithstanding the verdict. *Atlantic Richfield Co. v. Misty Products, Inc.*, 820 S.W.2d 414, 420–21 (Tex.App.-Houston [14th Dist.] 1991, writ denied). All testimony must be considered in the light most favorable to the party against whom the motion is sought, and every reasonable evidentiary inference must be indulged in that party's favor. *Id.* We cannot overturn the fact finder's ruling unless only one inference can be drawn from the evidence. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 461 (Tex. 1992).

Dr. J.D. Norris and Dr. Brian Heim are licensed Texas veterinarians and were called as expert witnesses for Odell. Odell correctly contends that the admissibility of expert testimony is governed by Rule 702 of the Texas Rules of Civil Evidence. *See Broders v. Heise*, 924 S.W.2d at 152. Rule 702 requires that: 1) the expert witness is qualified; 2) the expert's testimony consists of "scientific, technical, or other specialized knowledge"; and 3) the testimony assists the trier of fact to understand the evidence or determine a fact in issue. Tex.R. Civ. Evid. 702; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 556.

Odell's contention, however, overlooks the changes brought about in the application of Rule 702 by the holding in *E.I. du Pont de Nemours & Co. v. Robinson*. According to the ruling in that case, the trial court must now ensure that the expert's underlying scientific technique or principle is reliable before it can be admitted. 923 S.W.2d at 557. *Broders v. Heise* is distinguishable. The issue in *Broders v. Heise* was whether the plaintiffs met their burden of showing that their expert was qualified. That inquiry is not present in this action. Purina does not assert that Norris or Heim is unqualified to testify, but rather that their expert testimony is not sufficiently reliable to be admitted under Rule 702. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 556; *K Mart Corp. v. Rhyne*, 932 S.W.2d 140, 144 (Tex.App.-Texarkana 1996, no writ); *Microsoft Corp. v. Manning*, 914 S.W.2d 602, 615 (Tex.App.-Texarkana 1995, writ dism'd).

As a threshold issue, we must first determine whether Purina's contention is properly before us. Purina challenges the reliability of Odell's expert testimony. In order to preserve an issue for appeal, a party must raise the issue at the trial level. Tex.R.App. P. 52(a); *Davis v. Campbell*, 572 S.W.2d 660, 662 (Tex.1978); *Kuehnhoefer v. Welch*, 893 S.W.2d 689, 693 (Tex.App.-Texarkana 1995, writ denied). This has been the approach in other cases seeking to exclude expert witness testimony on reliability grounds. *See, e.g., E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 552; *North Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d at 95; *Thompson v. Mayes*, 707 S.W.2d 951, 956 (Tex.App.-Eastland 1986, writ ref'd n.r.e.).

Purina moved at trial to exclude Norris's and Heim's testimony on several grounds, but did not explicitly challenge the scientific reliability of their testimony. A trial court must, however, as a matter of law, perform its evidentiary gate-keeping function and ensure the scientific reliability of challenged expert testimony regardless of the arguments presented by counsel. *See* Tex.R. Civ. Evid. 104(a); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d at 556. Purina correctly contends that the trial court addressed only Norris's and Heim's qualifications and not the scientific reliability of their testimony as required by law. *E.I. du Pont*

*de Nemours & Co. v. Robinson,* 923 S.W.2d at 556. Purina's contention is properly before the court.

■ In *E.I. du Pont de Nemours & Co. v. Robinson,* the Texas Supreme Court adopted more restrictive standards for the admission of scientific expert testimony.[5] 923 S.W.2d at 556–57. In that case, the trial court excluded the testimony of Robinson's expert witness, concluding that it was not reliable. *Id.* at 552. The court of appeals reversed and remanded, holding that once a proponent established a witness's qualifications, the weight given the testimony and the credibility of the witness is determined by the trier of fact. *Robinson v. E.I. du Pont de Nemours & Co.,* 888 S.W.2d 490, 492–93 (Tex. App.-Fort Worth 1994), *rev'd,* 923 S.W.2d 549. This outcome was consistent with existing case law. *See, e.g., Simons v. City of Austin,* 921 S.W.2d 524, 531 (Tex.App.-Austin 1996, writ denied); *Guentzel v. Toyota Motor Corp.,* 768 S.W.2d 890, 897 (Tex.App.-San Antonio 1989, writ denied); *Houston Lighting & Power Co. v. Dickinson Indep. Sch. Dist.,* 641 S.W.2d 302, 310 (Tex.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.); *In re B__ S__ L__,* 579 S.W.2d 527, 530 (Tex.Civ.App.-San Antonio 1979, writ ref'd n.r.e.). The Supreme Court reversed, holding for the first time that Rule 702 required the proponent to show that the expert's testimony is not only relevant but also based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 556.

■ Purina sought to exclude Norris's and Heim's testimony. When a party objects to proposed expert testimony, the proponent of the expert testimony has the burden of demonstrating its admissibility. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 556–57. Odell must show that Norris's and Heim's testimony is based on a scientifically reliable foundation. TEX.R. CIV. EVID. 702; *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 556. To be reliable, the underlying scientific technique or principle must be grounded in the methods and procedures of science; otherwise it is no more than a subjective belief or unsupported speculation of no assistance to the trier of fact, and is inadmissible. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 557.

The situation in *E.I. du Pont de Nemours & Co. v. Robinson* is similar to that in this case. Du Pont, like Purina, allegedly manufactured and sold a contaminated product (fungicide).[6] *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 551. The Robinsons applied the fungicide to their pecan orchard, and the application allegedly damaged their pecan trees. *Id.* The Robinsons' expert witness, Dr. Carl Whitcomb, testified that the fungicide was contaminated and was responsible for the damage to the Robinsons' pecan trees. *Id.* His testimony is similar to that of Odell's expert witnesses, who opined that the metal present in Purina's feed was responsible for the development of hardware disease in some of Odell's cows. The Supreme Court concluded that Whitcomb's expert testimony was not based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 558. The court

---

5. As a general rule, once a proposition of law has been squarely decided by the Texas Supreme Court, the decision acts as binding precedent unless the court changes its decision. *Swilley v. McCain,* 374 S.W.2d 871, 875 (Tex.1964); *see also Moser v. United States Steel Corp.,* 676 S.W.2d 99, 103 (Tex.1984); *Whittlesey v. Miller,* 572 S.W.2d 665, 669 (Tex.1978). It is not clear, however, that the Texas Supreme Court has "squarely decided" this issue. Additional guidance on *Robinson's* application may be provided in the near future. The Texas Supreme Court granted writ in *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 907 S.W.2d 535 (Tex.App.-Corpus Christi 1994, writ granted), to decide whether the court of appeals erred in affirming the trial court's admission of the plaintiff's expert testimony. 39 Tex. Sup.Ct. J. 255–56. The case was argued on March 19, 1996. The decision is still pending. *Havner* differs from *Robinson.* *Havner* places the burden of proving the excludability of the expert testimony on the party opposing it, rather than requiring its proponent to demonstrate its admissibility. *Compare Merrell Dow Pharmaceuticals, Inc. v. Havner,* 907 S.W.2d at 550–51 *with E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 556–57. If *Havner* is correct, then Purina, rather than Odell, has the burden of persuasion on the admissibility of the disputed testimony. This question therefore appears to remain unsettled.

6. Purina does not contest the fact that its feed was contaminated. It does, however, dispute the extent of the contamination and its effect on Odell's dairy herd.

considered several factors in reaching its decision. · Similar factors are present to varying degrees in this case.

First, Whitcomb conducted no testing to exclude other possible causes of the damage to the Robinsons' pecan orchard, even though he admitted in his deposition that many of the symptoms could be caused by something other than contaminated fungicide. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 559. In this case, neither Norris nor Heim conducted tests to exclude other potential causes. Both Norris and Heim acknowledged that the metal might have come from other sources. Norris testified that the herd's injuries could be caused by metal ingested after they were taken off the Purina feed. Both experts testified that the cows could have gotten the metal from several other sources.

Second, the court in *Robinson* questioned Whitcomb's methodology. Whitcomb had no proof that the Robinsons' fungicide was contaminated and no knowledge as to what amount or concentration of contaminants would damage pecan trees. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 559. Unlike *Robinson,* there is no dispute in this case that some of the Purina feed was contaminated, but the evidence does not reveal how much of the feed was contaminated with metal or to what degree. Heim and Norris did not take random representative samples of all the Purina feed furnished to Odell. Norris and Heim postulated that because Odell fed his herd Purina feed, because some of the feed contained metal, and because some of the cows sustained injuries consistent with hardware disease, the contaminated feed must be the source of injury to all of the cows. This kind of reasoning cannot suffice where several possible causes might produce the same effect. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 559; *see also Sorensen By and Through*

*Dunbar v. Shaklee Corp.,* 31 F.3d 638, 649 (8th Cir.1994); *Claar v. Burlington Northern R.R.,* 29 F.3d 499, 502–03 (9th Cir.1994).

Third, in *Robinson,* Whitcomb's research and testimony were conducted and formed for the purpose of litigation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 559. The fact that an opinion was prepared solely for purposes of litigation does not automatically render it suspect, but it is more likely to be biased. *Id.* In this case, Norris was hired for the specific purpose of testifying as an expert witness. This does not apply to Heim, since he was not hired for purposes of litigation and has provided Odell with veterinary services since 1992 or 1993.[7]

Finally, in *Robinson* the plaintiffs offered no evidence to support their claim that Whitcomb's technique was an appropriate and reliable method to determine chemical contamination. The court emphasized the fact that Whitcomb's methodology had not been subjected to a rate of error analysis. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 559. In this case, neither Heim nor Norris conducted a methodological or technical study of all the cattle or representative samples of the feed. Neither Norris nor Heim presented any testimony regarding their respective rate of error analysis.

The facts in *Robinson* persuaded the Texas Supreme Court that Whitcomb's testimony was not reliable. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d at 560. They are equally applicable in our case. Scientifically unreliable evidence is of no assistance to the trier of fact and is inadmissible. With the exception of their testimony from personal knowledge gained from examining and diagnosing specific cows, Norris's and Heim's testimony lacked a reliable foundation, and it was an abuse of the trial court's discretion to admit the testimony in evidence.

---

7. Heim's testimony might be admissible as opinion testimony by a lay witness, even if excluded under Rule 702. *See* Tex.R. Civ. Evid. 701. Heim must have personal knowledge, and the opinion must be one that a reasonable person could draw from the underlying facts. The testimony must also help the jury understand a fact issue. 2A Steven Goode, Olin G. Wellborn, III & M. Michael

Sharlot, Courtroom handbook on Texas Evidence 384–85 (Texas Practice 1997). But if Heim's opinion calls for expertise, then his lay testimony is inadmissible, since it is neither rational nor helpful. *Id.* at 386; *see Hernandez v. Texas Employers Ins. Ass'n,* 783 S.W.2d 250, 252–53 (Tex. App.-Corpus Christi 1989, no writ).

■ The jury concluded that Purina was responsible for damages to Odell's entire dairy herd. Norris's and Heim's testimony provided the scientific basis for Odell's theory of causation. Without this testimony, there is little factual evidence to support the jury's conclusion that Purina's feed caused damage to all of Odell's cattle.

■ We are required to view the facts in the light most favorable to the verdict and consider only the evidence and inferences supporting it. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). The testimony regarding the delivery of Purina feed to Odell's dairy farm, its disbursement to Odell's herd, Odell's discovery of metal contaminants in a portion of the feed, Odell's notification to Tri–County of the problem on several occasions, Tri–County's notification to Purina of the contamination problem, Purina's acceptance of responsibility for the contamination, Tri–County's replacement of a magnet over its feed conveyor belts in July 1995, and the development of subsequent health g23 problems in some of Odell's cattle is undisputed.

Purina must prove there is less than a scintilla of evidence to support the jury's verdict to prevail on a legal sufficiency point of error. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). We overrule Purina's no evidence points of error.

We agree, however, that there is insufficient evidence to support the jury's verdict that the contaminated feed caused injury or probable future injury to all 200 head of Odell's cattle.

■ Odell pleaded several causes of action, including breach of warranty,[8] products liability, violations of the DTPA, and negligence. There can be no recovery of damages by an aggrieved party against another unless the harm was caused by the other's actions. *Wheaton Van Lines, Inc. v. Mason*, 925 S.W.2d 722, 728 (Tex.App.-Fort Worth 1996, writ denied). Negligence and breach of warranty require a showing of proximate cause, while a showing of producing cause is required for products liability and DTPA violations. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex.1995); *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995); *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181–82 (Tex.1995); *Prudential Ins. Co. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 160–61 (Tex.1995); *Rogowicz v. Taylor and Gray, Inc.*, 498 S.W.2d 352, 355–56 (Tex.Civ. App.-Tyler 1973, writ ref'd n.r.e.).

■ The components of proximate cause are cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 477; *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex.1992). These elements cannot be established by mere conjecture, guess, or speculation. *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex.1980); *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 755 (Tex.1975). Determining whether an actor's act or omission was a proximate cause of damages is usually a fact issue. *Donnell v. Spring Sports, Inc.*, 920 S.W.2d 378, 383 (Tex.App.-Houston [1st Dist.] 1996, writ denied); *see, e.g., El Chico Corp. v. Poole*, 732 S.W.2d 306, 315 (Tex. 1987); *McGuire v. Overton Mem. Hosp.*, 514 S.W.2d 79, 85 (Tex.Civ.App.-Tyler 1974), *writ ref'd n.r.e. per curiam*, 518 S.W.2d 528 (Tex. 1975). The issue may, however, be a question of law when the facts are conclusive. *See, e.g., Leitch v. Hornsby*, 935 S.W.2d 114 (Tex.1996); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 475; *Union Pump Co. v. Allbritton*, 898 S.W.2d at 774; *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 472 (Tex.1991); *Snellenberger v. Rodriguez*, 760 S.W.2d 237, 238 (Tex.1988); *Missouri Pac. R.R. Co. v. American Statesman*, 552 S.W.2d 99, 104 (Tex.1977).

■ Producing cause differs from proximate cause. Producing cause is an effi-

---

8. Remedies for breach of warranty are available when a buyer who has accepted goods discovers that they are defective in some manner. TEX. BUS & COM.CODE ANN. § 2.714 (Vernon 1994); *Southwestern Bell Tel. v. FDP Corp.*, 811 S.W.2d 572, 576 (Tex.1991). There are no true DTPA warranties, nor does the DTPA define the term "warranty." *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 233 (Tex.App.-Houston [14th Dist.] 1996, n.w.h.). To be actionable under the DTPA, the warranty must be established independently of the DTPA. *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 565 (Tex. 1984).

cient, exciting, or contributing cause that, in a natural sequence, produces the injuries or damages complained of and but for which injuries would not have occurred. *Union Pump Co. v. Allbritton,* 898 S.W.2d at 775; *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d at 182; *General Motors v. Hopkins,* 548 S.W.2d 344, 351 n. 3 (Tex.1977). Producing cause requires a lesser burden than proximate cause because it does not require foreseeability. *General Motors Corp. v. Saenz,* 873 S.W.2d 353, 357 (Tex. 1993).

■ Both proximate and producing cause require causation in fact. Causation in fact requires that the defendant's conduct be a substantial factor in bringing about plaintiff's damages. *Union Pump Co. v. Allbritton,* 898 S.W.2d at 775; *Prudential Ins. Co. v. Jefferson Associates, Ltd.,* 896 S.W.2d at 161; *Lear Siegler, Inc. v. Perez,* 819 S.W.2d at 472 n. 1.

To sustain an ultimate finding of causation in fact, Odell must establish by a reasonable medical or veterinary probability that each cow suffered, or will suffer, hardware disease as a result of its eating Purina feed. *See Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703 (Tex.1970); *Otis Elevator Co. v. Wood,* 436 S.W.2d 324 (Tex.1968); *see also Dartez v. Fibreboard Corp.,* 765 F.2d 456, 466–67 (5th Cir.1985); *Kircher v. Purina Mills, Inc.,* 775 S.W.2d 115, 117 (Mo.1989); *Missouri Farmers Ass'n v. Kempker,* 726 S.W.2d 723, 726 (Mo.1987); *Valiga v. National Food Co.,* 58 Wis.2d 232, 206 N.W.2d 377, 383 (1973).

■ As held in *Bormaster v. Henderson,* 624 S.W.2d 655 (Tex.App.-Houston [14th Dist.] 1981, no writ), a case involving the purchase and subsequent death of a cockatoo, it is no longer necessary for the expert witness to testify as to a reasonable medical or veterinary probability for the testimony to be admissible. There must be such a showing, however, to support the ultimate finding of causation.

---

**9.** An argument can be made, based on the evidence, that Odell failed to mitigate damages. No question was submitted to the jury on this issue.

■ Liability cannot turn on speculation or conjecture. Establishing causation requires that the plaintiff bring forth sufficient facts so that the evidence, and its logical inferences, support the reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about injury. *See Union Pump Co. v. Allbritton,* 898 S.W.2d at 775; *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d at 181; *Ramo, Inc. v. English,* 500 S.W.2d 461, 467 (Tex. 1973); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796–97 (1951). Causation must be based on a reasonable probability, rather than mere possibility. RESTATEMENT (SECOND) OF TORTS § 431 cmt. a-b (1965).

■ Disputed facts may be established by circumstantial or direct evidence. *McMillen Feeds, Inc. v. Harlow,* 405 S.W.2d 123, 130 (Tex.Civ.App.-Austin 1966, writ ref'd n.r.e). Absolute certainty is not required. *Id.* Nor must the plaintiff exclude every other possibility. *Community Pub. Serv. Co. v. Dugger,* 430 S.W.2d 713, 719 (Tex.Civ.App.-Texarkana 1968, no writ); *McMillen Feeds, Inc. v. Harlow,* 405 S.W.2d at 130. All that is required before there can be a finding of ultimate fact is proof of a causal connection beyond the point of conjecture or mere possibility. *Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d at 706.

■ Odell alleges that his herd's ingestion of contaminated Purina feed has resulted in physical injuries to his entire herd, as well as decreased milk production. Odell testified that he became aware of the problems with his cows in February or March 1995.[9] He testified that eight cows were diagnosed with displaced abomasum in early 1995. Three of these cows died. Odell testified that he never had health problems with his herd prior to their ingestion of Purina feed.

Odell testified that by May 1995, he had several cows diagnosed with displaced abomasum and hardware disease. Odell testified that nineteen cows have died. He stated that approximately forty cows are currently ill, although there is no evidence as to what

---

Any complaint of this point is waived. *See, e.g., Hycel, Inc. v. Wittstruck,* 690 S.W.2d 914, 924 (Tex.App.-Waco 1985, writ dism'd).

affects them. Odell testified that he had to sell sixteen of the sick cows while he could still get a price for them.

Purina contends that if it is responsible for any injuries to Odell's herd, it is liable for no more than eleven cows.

Odell relied primarily on the expert testimony of veterinarians Norris and Heim to establish causation. Even if the testimony of these experts was properly admitted, it did not provide a sufficient factual basis for the jury to conclude that the contaminated feed was responsible for injuries to Odell's entire herd. Neither witness testified that there was a reasonable probability that contaminated Purina feed had caused, or would in the future cause, hardware disease in the remainder of Odell's herd, other than the eleven cows actually diagnosed. Their testimony was only that the cows "might" be or "could" be so affected. Neither witness had examined, or even looked at, all the cows. Dr. Hein testified that he found in one cow a metal staple that could have come from a fence post, from hay, or from business forms that had been thrown in the trash bin, because cattle are indiscriminate eaters that will commonly eat things with metal in them. Neither expert witness had taken or tested representative samples of Purina's 170,000 pounds of feed given Odell's cattle, except the one small sample Odell collected and introduced in evidence. They testified that the metal particles introduced in evidence could have come from rust in the bin or from several different places. Neither witness made any study on hardware disease or any methodological study on Odell's cattle. Dr. Heim said that in one cow he necropsied he could not tell where the metal he found came from.[10] Dr. Heim only did necropsies on two cows, and he watched one done on one other cow. He could not tell the exact number of cows he had examined. Dr. Heim could only opine that "many" of Odell's cows were exhibiting symptoms of hardware disease. In one of the cows Dr. Heim necropsied, he found no metal.

Dr. Norris testified that the metal staple found in one cow was a "large fence-type staple." Dr. Norris testified that Odell had a classical case of a chronic hardware problem that "could totally devastate a herd, slowly and insidiously...." He also said, however, when asked on direct examination if in his opinion Odell would continue to have problems with hardware disease, "Oh, yes, sir. It's unknown what could be the future, what the future problems might be." When asked if he had an opinion if it was more likely than not that Odell would have a problem in all his herd, "or most part" of his herd, Norris said, "if this represents the sample, *the staple there*, it's more likely they're going to have more problems" (emphasis added). Dr. Norris said he did not do any independent testing on Odell's cows. He was also asked:

> Q Now, you were giving us your opinion about more likely than not of what would happen to the Odell's herd in the future just a minute ago.
>
> A Yes.
>
> Q Is it your opinion that all 200 of the cattle ... will suffer damage in the future based on the Purina feed?

Norris answered, "No, you don't know." He further testified that he had seen only one cow necropsied.

In another part of his testimony, Norris was asked, "And those lesions could have been caused by the Bois d'arc post staple just as well as it could have been caused by anything else, couldn't it?" He answered, "That's right, sure could." He also testified that he did not know if the sample of metal introduced in evidence came out of five pounds of feed or five hundred thousand pounds of feed.

Dr. Norris also testified that one could put his hands on top of a cow and press down and get a "gut check" to see if there is a possibility it has hardware disease. He did not make such a test on any animal, but watched Dr. Heim perform the technique on a "selected group" of Odell's cattle. He further testified that of the 200 Odell cattle, only eleven were diagnosed, and only two or three of those were diagnosed as having hardware disease.

10. A necropsy is the animal equivalent of a human autopsy.

Although the ultimate fact of causation must be supported by testimony showing reasonable medical or veterinary probability, the sufficiency of the evidence showing such probability does not turn on particular words such as "might," "could," or "probably"; the substance of the evidence must show a reasonable probability. *Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d at 707; *Otis Elevator Co. v. Wood,* 436 S.W.2d 324; *see also Insurance Co. of N. Am. v. Myers,* 411 S.W.2d 710 (Tex.1966); *Bormaster v. Henderson,* 624 S.W.2d 655. As can be seen from the testimony summarized above, the substance of Odell's expert witnesses' testimony does not support a finding of reasonable medical or veterinary probability; it only supports a finding of possibility.

Heim has provided veterinary services to Odell's dairy herd since 1992 or 1993. He testified that Odell's dairy cows did not suffer from hardware disease prior to Odell's distribution of the Purina feed to his herd. Norris and Heim opined that the cows that were probably affected by hardware disease got the metal from ingesting contaminated Purina feed.

Norris and Heim testified that the staples and metal found in the Purina feed could, if ingested, harm Odell's cows. Heim testified that the ingested metal might have come from sources other than the contaminated feed, such as hay, fence posts, trash bins, the pasture, or the barn. He testified that cows are indiscriminate eaters and will eat anything. Heim testified that once a cow eats a piece of metal, "there is no time frame on when it's going to cause a problem." He testified that the onset of hardware disease ranges from a few days to a year, or some distant future point in the cow's lifetime.

Norris testified that it was unknown what future problems may be experienced by Odell's herd. He said he did not know if all 200 head of cattle would suffer future harm if they had, in fact, ingested contaminated feed. He said that the cows he inspected at Odell's farm and believed to be suffering from hardware disease could have ingested the metal

causing their problem as recently as a month before his inspection (in January/February 1996). Odell stopped feeding his herd Purina feed in June 1995.

Necropsies conducted on three of Odell's cows showed evidence of hardware disease. Heim testified that he conducted necropsies on two of Odell's cows and was present for the necropsy conducted by Purina on March 30, 1996. Heim testified that he removed a magnet from the stomach of a necropsied cow in January 1996 and that the magnet was covered with metal particles.[11] Heim testified that, other than what was on the magnet, he did not recover any metal from the necropsied cow. Heim testified that he did not compare the metal present in the sample of the contaminated feed with the metal he removed from the necropsied cow. He said that the necropsy confirmed his diagnosis of hardware disease. Heim, however, also said he did not list the cause of the cow's death in his January 9, 1996 letter detailing the necropsy results and acknowledged that he did not mention hardware disease.

Norris and Heim testified that they were present during the necropsy conducted by Purina's experts at Odell's farm on March 30, 1996. Norris and Heim testified that lesions compatible with hardware disease were present on the cow's liver. Norris and Heim also testified that they observed two pieces of metal and some finer metal particles in the cow's reticulum. One piece of metal resembled a large fence-post staple, and the other resembled the staples present in the contaminated feed sample. Norris testified that he did not compare the metal removed from the necropsied cow with the contaminated feed sample. After being shown the sample of contaminated feed, Norris stated that the recovered staple resembled those in the feed sample. Norris opined that the recovered fence-post staple could cause hardware disease just as easily as the sample. Norris testified that there was no way of knowing the source of these pieces of metal.

11. Magnets are routinely placed in cows' stomachs to prevent hardware disease. The magnet attracts any metal ingested by the cows, prevent-ing migration and perforation of the cows' organs.

Norris and Heim did not provide testimony on the amount or concentration of metal needed to cause injuries to Odell's entire herd. Other than the metal evident in Plaintiffs' Exhibit # 2–the contaminated sample–there is no evidence as to the amount of metal present in the eight loads of Purina feed and ingested by Odell's herd.

Neither Norris nor Heim conducted tests excluding other possible sources of the cows' injuries. Norris testified that he was aware of tests aimed at diagnosing hardware disease, but that he did not conduct any such tests. Heim testified that he conducted a visual examination of most of Odell's herd. Heim also stated that he had not conducted any methodological or technical studies of Odell's herd to determine the cause and extent of their illness. Heim could not identify or give the number of cows he inspected. Heim explained that the bowed backs of the cows shown in plaintiffs' photographs were consistent with hardware disease. Heim testified that the bowing indicated abdominal pain. Norris testified that anything that causes the rumen to shut down produces abdominal pain, including displaced abomasum. Norris testified that hardware disease was just "one of a universe" of factors that could cause abdominal pain in a cow.

Heim testified that he did treat some of Odell's cows for displaced abomasum. Displaced abomasum results from the improper management of the herd's nutritional/feed program. Norris testified that the potential impact of Odell's nutrition management program needed to be examined. Odell testified he believed that his entire herd has been affected by their consumption of contaminated feed. Lay opinion is adequate to prove causation where general experience and common sense enables a laymen to determine, with reasonable probability, the causal relationship between the event and the condition. TEX.R. CIV. EVID. 701; *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984); *Baylor Medical Plaza Services Corp. v. Kidd*, 834 S.W.2d 69, 76 (Tex.App.-Texarkana 1992, writ denied); *Houston Gen. Ins. Co. v. Pegues*, 514 S.W.2d 492, 495 (Tex.Civ. App.-Texarkana 1974, writ ref'd n.r.e.).

Odell testified he started distributing the Purina feed to his herd on December 19, 1994, and that his cows started getting sick in February 1995, and by May 1995 some were being diagnosed with displaced abomasum and hardware disease. Odell testified that he had never had these problems before introducing the Purina feed to his dairy herd. Odell's testimony, however, fails to provide the jury with sufficient "reasonable probability" to conclude that the contaminated feed was responsible for the injuries to his dairy herd.

Dr. Chris Ashworth and Dr. Hank Spencer testified as experts on Purina's behalf. Ashworth's testimony as to the general causes and symptoms of hardware disease mirrored the explanations offered by Norris and Heim. They differed, however, on the possible causes of the injuries to Odell's cows.

Spencer conducted the March 30, 1996 necropsy. He testified that a two-inch nail was in one of the cow's stomachs, as well as some "metallic rocks." He disputed Norris's and Heim's testimony that a staple was also removed from the necropsied cow. Spencer admitted the presence of a lesion on the cow's liver, but described it as "non-pathogenic."

Ashworth's and Spencer's testimony established that there was metal present in the stomach of the cow necropsied on March 30, 1996.

The cattle's consumption of contaminated feed has an effect on their market value. A property owner may testify to the market value of his property. TEX.R. CIV. EVID. 701; *Porras v. Craig*, 675 S.W.2d 503, 505 (Tex. 1984); *Exxon Corp. v. Bell*, 695 S.W.2d 788, 790 (Tex.App.-Texarkana 1985, no writ). Odell testified that the market value of a healthy cow was $900.00. He also testified that, if a cow had eaten contaminated feed, its market value was only $300.00, for a net loss in value of $600.00.

Joe Don Pogue, a local cattle auctioneer, also testified to the adverse economic impact caused by the herd's ingestion of metal contaminated feed. Lay opinion based on personal knowledge and helpful to the determination of a fact at issue is admissible. TEX.R.

CIV. EVID. 701. Pogue has sold over 1,000,000 head of cattle. He testified that a healthy dairy cow sells for as much as $2,500.00 or as low as $700.00, depending on its condition. He testified that the average sale price is $1,250.00. Pogue stated that if Odell asked him to sell his cows and he was told that the cows had ingested 170,000 pounds of metal contaminated feed, he would be obligated to tell buyers of that fact. *See Empire & Assocs., Inc. v. Texas Contractors Rentals, Sales, & Supplies, Inc.*, 567 S.W.2d 578, 580 (Tex.Civ.App.-Waco 1978, writ ref'd n.r.e.). Pogue testified that, if the information was known by potential buyers, the cows' market value would fall to $300.00 each.

This is some evidence that the mere fact that Odell's herd ingested metal contaminated feed has an adverse economic impact on their value. This conclusion, however, is based on a response to a single hypothetical question that assumes the *entire herd consumed 170,000 pounds of metal contaminated feed.* The evidence presented to the jury on this point consisted of Odell's testimony and a single magnet, three inches by one inch in size, covered with metal contaminated feed. This evidence is factually insufficient to support a conclusion that the market value of all the herd was reduced because of the contaminated feed.

We find the evidence, taken as a whole, factually insufficient to support a finding that, in reasonable probability, Purina's contaminated feed has caused, or will probably in the future cause, hardware disease in all 200 of Odell's cattle. Although we find some evidence of causation, we conclude that it is factually insufficient to support the verdict.

Purina makes two other contentions that must be addressed by the trial court on remand. First, Purina correctly contends that Odell failed to make an election of remedies. Second, Purina correctly asserts that the jury's award of attorney's fees as a percentage of Odell's recovery violates the Supreme Court's recent ruling in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (1997).

Odell received favorable jury findings under the following theories of recovery: breach of warranty, products liability, violations of the Texas Deceptive Trade Practices Act, and negligence. The recoveries allowed under these theories differ.[12] Purina requested that Odell be required to make an election of remedies, but the trial court refused the request.

A party who seeks redress under two or more theories of recovery for a single wrong, as in this case, must elect before judgment is rendered on which remedy he wishes the court to enter judgment. *Birchfield v. Texarkana Mem. Hosp.*, 747 S.W.2d 361, 367 (Tex.1987); *Star Houston, Inc. v. Shevack*, 886 S.W.2d 414, 422 (Tex.App.-Houston [1st Dist.] 1994), *writ denied per curiam*, 907 S.W.2d 452 (Tex.1995). If the prevailing party fails to make an election, the trial court should use the findings affording the greater recovery and render judgment accordingly. *Star Houston, Inc. v. Shevack*, 886 S.W.2d at 422. In determining which cause of action or measure of damages provides the greatest relief, the trial court may consider attorney's fees. *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 812 (Tex.App.-Dallas 1987, no writ). If Odell recovers on retrial, he must make an election of remedies. If he does not, then the trial court should act accordingly.

Attorney's fees awarded under the DTPA can no longer be awarded as a percentage of the judgment. *See Arthur Andersen & Co. v. Perry Equip. Co., supra.* In *Arthur Andersen Co. v. Perry Equip. Co.*, the Supreme Court held that to recover attorney's fees under the DTPA, a plaintiff must prove that the fee amount was both reasonably incurred and necessary to the prosecution of the case. A plaintiff cannot simply ask the jury to award a percentage of

---

12. Economic losses, such as lost milk production, are not recoverable as an element of damages under strict products liability. *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 78 n. 1 (Tex.1977); *Lockwood Corp. v. Spencer*, 613 S.W.2d 369, 370 (Tex.Civ.App.-Amarillo 1981, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF TORTS § 402A (1965). Economic losses are recoverable under the UCC's implied warranties and negligence. *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d at 78 n. 2, 80. The jury also awarded Odell attorney's fees in the sum of 33-1/3% of the recovery. Attorney's fees are recoverable under the DTPA, but not under products liability or negligence causes of action.

the recovery as attorney's fees. *Id.* Odell's counsel testified that he made a contingent fee arrangement with Odell and agreed to accept a one-third percentage of any recovery. He also testified that he did not have any documentary evidence of the services or time spent on this case.[13] The jury awarded Odell attorney's fees in the sum of 33–1/3% of the recovery. While this practice was acceptable prior to *Arthur Andersen & Co. v. Perry Equip. Corp., supra,*[14] it is no longer permitted. If on remand Odell is successful on his DTPA claim and is awarded attorney's fees, the trial court should ensure that the awarded attorney's fees are not in the form of a percentage of the total recovery, but instead are supported by evidence that the fees were reasonably incurred in connection with the successful prosecution of Odell's action.

For the reasons stated, we reverse the judgment and remand the cause for a new trial.

GRANT, J., concurs in the result.

---

13. When a suit involves more than one cause of action, including a cause of action in which attorney's fees are recoverable, as a general rule the party seeking to recover such fees must present specific evidence indicating the amount of time incurred on that cause of action. *Bray v. Curtis*, 544 S.W.2d 816, 819 (Tex.Civ.App.-Corpus Christi 1976, writ ref'd n.r.e.). An exception exists, however, when the causes of action are so intertwined as to be inseparable. *Village Mobile Homes, Inc. v. Porter*, 716 S.W.2d 543, 552 (Tex. App.-Austin 1986, writ ref'd n.r.e.).

14. *See, e.g., Berry Property Management, Inc. v. Bliskey*, 850 S.W.2d 644, 669 (Tex.App.-Corpus Christi 1993, writ dism'd by agr.)